*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0315P (6th Cir.)
File Name: 04a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN R. HICKS,
    *Petitioner-Appellant,*

    *v.*          No. 01-3764

TERRY COLLINS, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00177—Herman J. Weber, District Judge.

Argued: March 9, 2004

Decided and Filed: September 15, 2004

Before: SILER, DAUGHTREY, and CLAY, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Marc D. Mezibov, MEZIBOV & JENKINS, Cincinnati, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Marc D. Mezibov, MEZIBOV & JENKINS, Cincinnati, Ohio, Jarrod M. Mohler, ROBBINS, KELLY,

---

PATTERSON & TUCKER, Cincinnati, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

SILER, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CLAY, J. (pp. 30-43), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

SILER, Circuit Judge. Petitioner John R. Hicks was convicted after a trial by jury of two counts of aggravated murder, Ohio Revised Code (O.R.C.) § 2903.01(B), and one count of aggravated robbery, O.R.C. § 2911.01. He was sentenced to death. O.R.C. §§ 2929.04(A)(3), (A)(5), and (A)(7). After unsuccessful direct appeals and state post-conviction proceedings, Hicks filed a petition for a writ of habeas corpus in accordance with 28 U.S.C. § 2254. The district court denied the petition and he appeals to this court. For the following reasons, we **AFFIRM**.

### I. BACKGROUND

On August 2, 1985, Hicks acquired some cocaine in Cincinnati, Ohio. After ingesting the drug, he desired more and took the videocassette recorder (VCR) from the home he shared with his wife, Ghitana, and stepdaughter, Brandy Green. Hicks gave the VCR to a drug trafficker as security for a cocaine purchase. After consuming the cocaine, Hicks realized he had no money with which to redeem the VCR. Recognizing that the missing VCR would lead to problems with Ghitana, he decided to rob Maxine Armstrong, who was Ghitana's mother and his mother-in-law. He knew that "if [he] robbed her he would have to kill her." *State v. Hicks*, 538 N.E.2d 1030, 1032 (Ohio 1989). Hicks went to

Armstrong's apartment, where he found Brandy asleep on the couch. He woke her, put her to bed, and prepared to kill Armstrong, telling himself, "you go do it or you don't." *Id.* at 1033.

Hicks killed Armstrong by strangling her with a clothes line he had brought with him. He stole approximately $300 and some credit cards from her apartment. He then retrieved the VCR from the drug dealer and purchased more cocaine. Around 12:30 a.m. on August 3, after injecting the cocaine, he "got to thinking again" and realized that Brandy could identify him as the last person to visit Armstrong. Therefore, he decided to return to the apartment to kill Brandy.

Upon returning to Armstrong's apartment he tried to smother Brandy with a pillow. As Brandy was "bucking" and "fighting," he tried to choke her with his hands. When she continued to make breathing sounds, he affixed duct tape over her nose and mouth. After killing Brandy, Hicks moved Armstrong's body into the bathtub so that he could dismember it for easier disposal. After nearly severing one of her legs with a kitchen knife, however, he gave up and returned to the bedroom where Brandy's body was located. He removed her underwear and digitally penetrated her vagina. He then stole other items from the apartment, returned to his own apartment, and fled Cincinnati. On August 4, he surrendered to police in Knoxville, Tennessee, where he confessed to both murders. Hicks was returned to Cincinnati and made additional incriminating statements to Cincinnati homicide detectives Robert Hennekes and Joe Hoffman.

After Hicks was indicted, he filed a suggestion of incompetence to stand trial. The trial court conducted evidentiary hearings and found him competent to stand trial. While the trial court denied the majority of Hicks's pre-trial motions, it deferred ruling on his motion for funding to hire experts until he could "provide more specific information as to the identity and qualification of said expert or experts, the

relationship of the expert's expected testimony . . . and the cost of said expert."

The guilt phase of Hicks's trial began on February 3, 1986. Hicks did not present any evidence on his insanity defense and subsequently withdrew his insanity plea. On February 12, 1986, the jury found Hicks guilty on all counts. The sentencing phase of his trial began on February 13, 1986, and Hicks presented mitigating evidence and made an unsworn statement. On February 14, 1986, the jury recommended death for the murder of Brandy Green and life imprisonment for the murder of Maxine Armstrong. Based upon its independent review of the evidence, the trial court sentenced Hicks to death for Green's murder, thirty-years' imprisonment for Armstrong's murder, and ten to twenty-five-years' imprisonment for aggravated robbery.

Hicks appealed to the Ohio Court of Appeals and asserted nine assignments of error. In 1988, the appellate court affirmed his convictions. He appealed to the Supreme Court of Ohio, asserting ten assignments of error. It rejected his arguments and affirmed his sentences. Hicks's subsequent motion for rehearing was denied by the Ohio Supreme Court in 1989. He then filed a petition for writ of certiorari in the United States Supreme Court, but it was also denied.

In 1990, pursuant to O.R.C. § 2953.21, Hicks filed a petition for post-conviction relief in the Hamilton County Court of Common Pleas, raising forty-one issues for review. The trial court denied his motion for relief from judgment. Hicks appealed to the court of appeals, raising twelve assignments of error. In 1993, the appellate court affirmed the decision of the trial court. Hicks then sought discretionary review before the Ohio Supreme Court, which dismissed his appeal on July 21, 1993, for lack of a substantial constitutional question.

In the interim, Hicks filed an application for delayed consideration in the Ohio appellate court in September 1992,

submitting thirty-seven assignments of error. On December 1, 1992, the appellate court denied his application and he appealed to the Ohio Supreme Court. On October 27, 1993, the Ohio Supreme Court affirmed. On December 15, 1993, the Ohio Supreme Court denied his motion for rehearing. On March 5, 1993, Hicks filed a motion for reinstatement of direct appeal in the Ohio Supreme Court, which in turn denied his request.

In 1994, Hicks filed a petition for a writ of habeas corpus with the United States District Court for the Southern District of Ohio. An evidentiary hearing was held in 1997. In April 2001, the district court entered its thorough 171-page order denying Hicks's petition. However, it issued a certificate of appealability ("COA") on the issues of ineffective assistance of counsel during the guilt and penalty phases and prosecutorial misconduct. We granted Hicks's request for a COA on the additional issue of ineffective assistance of appellate counsel.

## II. STANDARD OF REVIEW

### A. Pre-AEDPA

Hicks filed his habeas petition before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). "Under pre-AEDPA analysis, 'this court reviews a district court's refusal to grant a writ of habeas corpus *de novo*, but reviews the district court's factual findings for clear error.'" *Zuern v. Tate*, 336 F.3d 478, 481 (6th Cir. 2003) (quoting *Coe v. Bell*, 209 F.3d 812, 823 n.2 (6th Cir. 2000)).

### B. Procedural Default

Hicks has procedurally defaulted every claim except the ineffective assistance of trial counsel claims and one prosecutorial misconduct claim regarding an appeal to the jury to act as the community's conscience. When "a state prisoner has defaulted his federal claims in state court

pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[1] *Monzo v. Edwards*, 281 F.3d 568, 575 (6th Cir. 2002) (citations omitted). In determining whether a claim has been procedurally defaulted, this court has applied the following four-part test: (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced that state procedural rule; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986).

In Ohio, res judicata bars state courts from considering constitutional claims in post-conviction collateral attacks (brought under Ohio Rev. Code Ann. § 2953.21) when those claims have already been or could have been fully litigated on direct appeal. *Monzo*, 281 F.3d at 576. Res judicata also bars ineffective assistance of *trial* counsel claims, not asserted on direct appeal, when the defendant is represented by a different counsel on direct appeal. *Id.* at 576-77. However, if the defendant was represented by the same counsel at trial and on direct appeal, claims of ineffective assistance of *trial* counsel

---

[1] Hicks does not assert actual innocence and thus does not claim the other excuse - a manifest miscarriage of justice. *See Murray v. Carrier,* 477 U.S. 478, 496 (1986) (court may grant writ in the absence of a showing of cause and prejudice when "a constitutional violation has probably resulted in the conviction of one who is actually innocent").

are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial. *See Buell v. Mitchell*, 274 F.3d 337, 348 n.3 (6th Cir. 2001).

Hicks had the same counsel on direct appeal, so his ineffective *trial* counsel claims are cognizable; however, he has procedurally defaulted his other claims regarding ineffective *appellate* counsel and prosecutorial misconduct (other than the jury-as-community-conscience claim) because he did not assert the claims on direct appeal. Seeking to excuse this default, Hicks naturally argues ineffective assistance of appellate counsel for failing to raise the defaulted claims on direct appeal. Unfortunately for Hicks, he has procedurally defaulted his ineffective appellate counsel claims as well. While defendants may assert ineffective assistance of counsel as cause to excuse procedural default, the ineffective assistance excuse "can itself be procedurally defaulted." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Monzo*, 281 F.3d at 575-578. A strikingly on-point case, *Coleman v. Mitchell*, 244 F.3d 533 (6th Cir. 2001), shows that Hicks has procedurally defaulted his ineffective appellate counsel claim and, as a result, defaulted all other claims upon which he asserts ineffective appellate counsel as cause.

In Ohio, pursuant to *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992), ineffective assistance of appellate counsel claims must be raised in a delayed motion for reconsideration to the direct appeal court, not in a petition for state post-conviction relief. *Coleman*, 244 F.3d at 539. In April 1991, Hicks incorrectly asserted his ineffective appellate counsel claim in his petition for post-conviction relief, and the post-conviction court dismissed the claim pursuant to the appellate court's rule that ineffective appellate claims should be asserted in reconsideration motions. The Ohio Supreme Court subsequently adopted that rule in *Murnahan* in February 1992. Hicks waited seven months after *Murnahan* (September 1992) to file a delayed reconsideration application – the correct motion for an ineffective appellate counsel claim. The Ohio Court of Appeals denied the reconsideration

application because Hicks failed to show good cause to justify his delay, *i.e.*, Hicks filed his reconsideration application too late.

As a result, the *Murnahan* rule requiring ineffective appellate counsel claims to be filed in reconsideration applications rather than post-conviction petitions stands as an independent state ground barring this court from considering Hicks's claim. Hicks asserts the same defense we rejected in *Coleman*, namely, that the Ohio courts were split on the correct procedure before *Murnahan*. However, as in *Coleman*, since the rule was well settled in the court of appeals where Hicks appealed that ineffective appellate counsel claims should be asserted in reconsideration applications, the rule represents an established adequate and independent state ground. *Coleman*, 244 F.3d at 539-40. Thus, Hicks has procedurally defaulted his ineffective appellate counsel claim and, in turn, all the claims he failed to bring on direct appeal because he cannot assert it as cause.

In sum, all of Hicks's claims not directly asserted on appeal are procedurally defaulted because he procedurally defaulted his ineffective assistance of appellate counsel claim and cannot assert it as cause. The exception exists for all claims of ineffective *trial* counsel because the same counsel served as trial and appellate counsel.

## DISCUSSION

### A. Ineffective Assistance of Trial Counsel

### 1. Cocaine Expert

Hicks first alleges that he was denied the effective assistance of counsel during the guilt phase of his trial because his counsel failed to consult with or obtain an expert on the effects of cocaine on the human body. Prior to trial, Hicks's counsel, Dominic Perrino and James Rueger, filed a notice of intent to rely on the defense of not guilty by reason

of insanity. Hicks had not been evaluated prior to the filing of this notice and none of the three experts who subsequently evaluated him concluded that he was insane on the date of the murders. As Hicks's counsel realized during pretrial investigation that his cocaine ingestion could affect the guilt and penalty phases of his trial, they applied for the appointment of an expert witness pursuant to O.R.C. § 2929.024.[2] Hicks's counsel anticipated the need for an expert on the pharmacological, physiological, and psychiatric effects of cocaine, specifically as it related to his ability to form intent to commit aggravated murder and any diminished mental capacity for mitigation purposes. The trial court advised Hicks's counsel that if they came forward with such an expert witness the request would probably be granted. The trial court deferred ruling on Hicks's motion, specifically "taking it under submission pending further evidence, further argument from defense counsel." Nevertheless, Hicks's counsel neither renewed the motion to appoint an expert nor obtained an expert, instead relying upon the testimony of Dr. Nancy Schmidtgoessling, a court-appointed psychologist.

Dr. Schmidtgoessling's testimony on Hicks's behalf was less than favorable. Although Dr. Schmidtgoessling did not hold herself out as a "cocaine expert," she had been directed to evaluate Hicks regarding his competency and to determine if he was insane on the date of the crimes. While she testified that Hicks's criminal actions were consistent with cocaine intoxication and that he was probably impaired, she nonetheless opined that he acted with purpose and intent. According to Hicks, Dr. Schmidtgoessling inaccurately testified as to the following: voluntary cocaine intoxication

---

[2]O.R.C. § 2929.024 provides that if an indigent defendant is charged with aggravated murder, the court in its discretion may authorize defense counsel to obtain an expert if necessary for the proper presentation of the defendant's trial or sentencing hearing. The payment for the expert's fees and expenses are to be made in the same manner that payment for appointed counsel is made pursuant to Chapter 120 of the Ohio Revised Code.

does not meet the definition of "disease or defect"; Hicks understood his actions; the duration of cocaine intoxication peaks at about fifteen to twenty minutes; and injection of cocaine, rather than inhalation, leads to a quicker reaction, although "the intensity or symptoms are equally the same" whether injecting or inhaling it. Dr. Schmidtgoessling's testimony was damaging to Hicks's case because it significantly narrowed the time in which he could have been acting under the influence of cocaine. Because Hicks's counsel were surprised by Dr. Schmidtgoessling's testimony and "as to the affect that she testified as her qualifications as to what cocaine affect has on a person, how long lasting it was," they attempted to use Dr. Ross Zumwalt, the Hamilton County Coroner, as a "cocaine expert" during cross-examination. Dr. Zumwalt's testimony did not benefit Hicks. The district court denied Hicks's habeas relief on his claim of ineffective assistance of trial counsel because he feigned mental illness and refused to cooperate with his counsel, concluding that Hicks's "failure to cooperate had an adverse impact on the ability of his defense counsel to conduct his defense and that the decision to use Dr. Schmidtgoessling as a defense expert was a tactical decision by counsel and appropriate under the circumstances."

For Hicks to establish a violation of the Sixth Amendment right to counsel, he must satisfy two components. First, he must show that his counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed [him] by the Sixth Amendment." *Wickline v. Mitchell*, 319 F.3d 813, 819 (6th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Second, he "must show that the deficient performance prejudiced the defense[,] . . . [which] requires showing that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* (quoting *Strickland*, 466 U.S. at 687). "To demonstrate that counsel's performance was deficient, [Hicks] 'must show that counsel's representation fell below an objective standard of reasonableness.'" *Roberts v. Carter*,

337 F.3d 609, 614 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688). To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wickline*, 319 F.3d at 819 (quoting *Strickland*, 466 U.S. at 694). Our "[r]eview of counsel's performance is highly deferential and requires that [we] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact entitled to de novo review." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000).

On habeas review at the evidentiary hearing before the district court, Hicks offered the testimony of Dr. Theodore Parran, an expert on the effects of cocaine use.[3] Dr. Parran observed that Hicks suffered from cocaine psychosis, which is an extreme psychotic state brought about by frequent cocaine binging, at the time of the crimes. According to Dr. Parran, Dr. Schmidtgoessling's testimony was erroneous and the jury was misinformed as to Hicks's condition. In fact, he viewed her testimony as the "primary information which was inaccurate[.]" Rueger testified at the evidentiary hearing that the defense's decision not to employ a "cocaine expert" was not the result of any tactical decision; rather, it was a matter of economics because he did not believe the trial court "was going to appoint anybody that wasn't from around [the Cincinnati] area." In his deposition, Perrino testified that he was "somewhat taken aback and surprised" by Dr. Schmidtgoessling's testimony regarding the duration of the cocaine's influence on Hicks and that he "was unaware prior to trial as to the duration[] because we did not have a witness

---

[3] Hicks claims Parran to be a "cocaine expert" because he allegedly "devotes approximately 70% of his time to the treatment of individuals who are addicted to cocaine and other illegal substances."

to testify as to the effects of cocaine and the duration it would" have upon a person. Dr. Schmidtgoessling conceded that, to the best of her recollection, she did not expect to render an opinion on anything other than Hicks's competency and insanity.

"In Ohio, evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation and premeditation.'" *Combs*, 205 F.3d at 288 (quoting *Ohio v. Fox*, 428 N.E.2d 410, 412 (Ohio 1981)); *see also State v. Wolons*, 541 N.E.2d 443, 446 (Ohio 1989).[4] In *Combs*, this Court was presented with a similar claim of ineffective assistance of counsel. Combs's counsel employed one expert witness, Dr. Roger Fisher, a clinical psychologist, to testify as to Combs's drug and alcohol abuse and his intoxication on the day he committed two aggravated murders. Although Combs's counsel intended to elicit testimony that Combs was incapable of acting with purpose or intent due to his diminished capacity, Dr. Fisher opined during cross-examination that Combs acted purposefully and intentionally even though he was intoxicated. Identically, Hicks claims that his counsel's failure to anticipate, avoid, or prepare for Dr. Schmidtgoessling's damaging testimony constituted ineffective assistance of counsel. Moreover, as in *Combs*, the prosecution highlighted the inconsistencies between the defense's theory of voluntary cocaine intoxication and Dr. Schmidtgoessling's testimony during its closing argument. The district court, however, differentiated *Combs* from Hicks's claim "because Dr. Parran could not have testified that [] Hicks's use of cocaine negated his ability to act purposely, his input would not have altered the results of the trial and defense counsel would have been subjected to the same criticism which carried the day in *Combs* . . . ."

---

[4] As of October 27, 2000, however, "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." O.R.C. § 2901.21(C).

Despite any similarity to *Combs*, Hicks was not denied the effective assistance of counsel. First, there was overwhelming evidence of Hicks's guilt; therefore, he cannot demonstrate "that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt about his guilt." *Id.* at 290 (citing *Strickland*, 466 U.S. at 695). Accordingly, Hicks failed to satisfy the prejudice prong of *Strickland*.

Second, the record indicates that Hicks was a malingerer who refused to assist his counsel in the preparation of his defense. For example, prior to trial Perrino informed the trial court that defense counsel needed a "cocaine expert" because they did "not have assistance from our client except that we know from certain things that he indicated in statements that were given to us to the ingestion of cocaine and what its effect may have on him." Furthermore, although Rueger observed that Hicks was "fully communicative" during their first meeting, Hicks later "went into a shell, . . . wouldn't talk, wouldn't look at you, just stared off in the distance and kind of rocked back and forth." Rueger also insisted that Hicks's lack of cooperation and participation in his own defense adversely affected his counsel's preparation of the case. Rueger cited a specific instance in which he and Perrino "couldn't even communicate or ask [Hicks] whether or not the notes that the Police Officers in Cincinnati had taken . . . were consistent with what he remembered talking to them about." Dr. James Reardon, a counseling psychologist who testified during the evidentiary hearing on behalf of Warden Collins, insisted that "Dr. Schmidtgoessling was prevented from administering and interpreting any psychological tests" upon Hicks due to his feigning mental illness; Dr. Schmidtgoessling could not obtain "any kind of coherent history or representation of the circumstances and facts of the case based on [] Hicks's behavior"; and by reason of Hicks's behavior and lack of cooperation, his counsel were unable to have any psychological tests performed upon him, "which may have contributed to their ability to assess him in a more complete way."

Third, and most importantly, even if the jury had been informed of cocaine psychosis and its effects, the result of the proceeding would not have been different. Like Dr. Schmidtgoessling, Dr. Parran testified that Hicks's actions were purposeful and that "certainly people can do purposeful actions when they're involved in cocaine psychosis." Additionally, Dr. Parran could not testify that Hicks was insane at the time he committed the offenses. The decision to employ Dr. Schmidtgoessling was a direct result of Hicks's refusal to cooperate with his counsel. *See Coleman*, 244 at 545 (death penalty petitioner was not subjected to ineffective assistance of counsel where he did not cooperate with his counsel concerning the investigation and identification of mitigating evidence, imposed restrictions upon his counsel, and refused to submit to further psychological or psychiatric testing). A fair assessment of counsel's performance requires that we "evaluate [their] conduct from counsel's perspective at the time." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 690).

**2. Prejudicial Comments**

Hick next claims that his counsel was ineffective for failing to object to (1) "the prosecution's statements that the community and state of Ohio mandate the death penalty" against him; (2) the prosecution's representations that "they had already determined that Hicks was guilty, and that death was the only appropriate punishment"; (3) statements made by both the trial court and prosecution during voir dire that the jury's decision on the question of life or death was merely a "recommendation"; and (4) the prosecution's "incorrect and misleading statements about the legitimacy of the defense of not guilty by reason of insanity." Hicks's objections on these points are without merit. In each instance, Hicks either mischaracterizes the objectionable statement, cites a statement

to which a proper objection was lodged,[5] or objects to a statement that was not improper.[6]

A second subset of Hicks's "failure to object" claims centers on the prosecution's closing argument. Specifically, Hicks argues that his counsel was ineffective for failing to object to (1) the prosecution's comments about the penalty phase; (2) victim impact statements; (3) the prosecution's expression of its opinion respecting Hicks's guilt and the statement that "[t]here is no doubt in the defense's mind that the defendant was guilty"; and (4) the prosecution's statement that even the trial court did not believe Hicks's defenses. A review of the record reveals that these objections are wholly groundless, with the exception of the prosecution's comment about the defense's state of mind. On its face, this comment is inappropriate. A review of the context in which it was made, however, illustrates that it was harmless. The comment was made in the course of the prosecution's explanation that not even the defendant contested that he was the one who had murdered the victims. Therefore, the statement was hardly prejudicial.

Hicks also asserts two other claims of ineffective assistance during the guilt phase. First, he argues that counsel was ineffective for failure to preserve records of side-bar conferences. Second, Hicks argues that his counsel was ineffective because they repeatedly referred to his crimes as "dastardly" and "heinous." The first claim is without merit because Hicks makes no attempt to show how the allegedly-

---

[5] For example, Hicks objected to the prosecution's reference to the jury's penalty determination as a "recommendation" and moved for a mistrial. The trial court sustained the objection but denied the mistrial motion.

[6] Examples of such statements are the prosecution's voir dire questions regarding the validity of the insanity and intoxication defenses. The statements were not improper, particularly considering that there was evidence that Hicks had feigned insanity and was malingering.

faulty record-keeping prejudiced him – he does not explain how the proceedings would have been different. The second claim is without merit because counsel's depiction of his client's crimes as "dastardly" and "heinous" may well have been a tactical decision designed to encourage the jury to spare Hicks's life by convincing it that he recognized the brutality of his crimes. The wisdom of using such adjectives is certainly subject to challenge in hindsight, but it is precisely this sort of hindsight-driven judgment that *Strickland* forbids.

### 3. Mitigation

Hicks further claims that his trial counsel was ineffective in failing to introduce evidence of his abusive upbringing, problems in school, poor self-esteem, and history of drug and alcohol abuse in mitigation. Arguably his most compelling contention is that counsel should have, at a minimum, called some sort of expert witness instead of relying on the testimony of his mother and six former co-workers, who generally testified that Hicks was a "good guy" and that his crimes were out of character. At the evidentiary hearing before the district court, Dr. Susan Shorr, a mitigation specialist, and Dr. Julia Hawgood, a clinical psychologist, opined that this failure to call a psychiatric or psychological expert rendered counsel's mitigation efforts ineffective.

Under the *Strickland* standard, however, Hicks's counsel was not constitutionally ineffective in mitigation. This is so because, as the district court found, "Mr. Hicks did not assist his counsel because he was feigning the symptoms of mental illness." It is significant that Dr. Shorr, who testified at the evidentiary hearing that counsel's mitigation strategy was substandard, "did not consider, in making her opinion, the fact that Mr. Hicks refused to cooperate with his counsel." Similarly, Dr. Hawgood, whose testimony was to the same effect, conceded that "Mr. Hicks admitted [to her, in the course of her evaluation of him] that prior to and during his

trial he had feigned mental illness."[7] This singular fact – that Hicks did little to participate in his own defense because he was faking a mental illness – distinguishes this case from those Hicks relies upon and effectively forecloses a finding that counsel was ineffective.

Hicks further argues that his counsel was ineffective in failing to present his history of sexual abuse to the jury. He alleges that his counsel "entirely overlooked the detailed information concerning [his] background that Shirley Leahy had compiled for the court psychiatric clinic."[8] Leahy compiled a detailed report concerning Hick's background which, although her report was available to Hicks's counsel for mitigation purposes, was never used. Hicks also claims that while many of his relatives were prepared to testify during the mitigation phase of his trial, none was called to do so.

Despite Hicks's contentions, his counsel was not ineffective. Hicks was uncooperative and never communicated any history of sexual abuse to his counsel. Although Perrino reviewed Leahy's report, defense counsel's failure to introduce the report or call Leahy as a witness was probably a tactical decision. For instance, in the "Sexual History" section of Leahy's report, she documented that Hicks was molested by a fourteen-year-old male cousin when he was eight years old. In addition, Hicks confided in Leahy that he engaged in homosexual prostitution as a teenager and after he married his first wife. If Leahy's report had been

---

[7] This concession is particularly damaging to Hicks's specific contention that counsel was ineffective for failing to call a psychologist or other expert during the mitigation phase because, had counsel in fact called such an expert, the prosecution could have introduced this concession in rebuttal. As it was, the jury was not privy to this damning information.

[8] Shirley Leahy, a clinical social worker who interviewed Hicks prior to trial, aided Dr. Schmidtgoessling in constructing Hicks's social history.

admitted or she had testified, the jury would have learned this information. In all likelihood, this fact would have been unfavorable to Hicks. Furthermore, while Hicks was molested by a juvenile when he was a child, Hicks molested Brandy, postmortem, when he was an adult. Therefore, defense counsel made a tactical decision to keep this potentially-damaging information from the jury.

We "reject[] [Hicks's] claim that the failure of his counsel to investigate mitigating evidence amounted to ineffective assistance because [Hicks was] uncooperative . . . ." *Martin v. Mitchell,* 280 F.3d 594, 612 (6th Cir. 2002) (citing *Coleman,* 244 F.3d at 545-46). There is an "extremely high standard that must be met for counsel's representation in the penalty phase to be considered constitutionally inadequate[,]" *Mason v. Mitchell,* 320 F.3d 604, 643 (6th Cir. 2003) (Boggs, J., dissenting), and Hicks has fallen short of that standard.

### 4. Penalty Phase

The overwhelmingly majority of Hicks's panoply of penalty phase ineffective assistance claims relate to counsel's perceived ineffectiveness in failing to object to certain comments made by the prosecution during closing arguments. Generally, these claims are without merit and, dependent as they are on the merits of the underlying prosecutorial misconduct claims, are addressed elsewhere.

Perhaps Hicks's strongest claim in this regard is that his counsel was ineffective for failing to object to the prosecution's mention of his likelihood of recidivism. Stated the prosecutor: "I think that is one of the primary considerations you should make. In twenty or thirty years what happens if [Hicks] does this again?" Even this claim ultimately fails – assuming that such a comment is

inappropriate,[9] it certainly does not rise to the level of prosecutorial misconduct. As the evidence against Hicks was more than substantial, *see Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003), and Hicks's counsel objected to this statement, Hicks received the effective assistance of counsel.

Hicks also advances two claims arising from the acts of his own counsel. First, Hicks finds fault with one of his attorney's statements to the jury regarding Hicks's parole eligibility. Second, Hicks objects to counsel's statement in closing that "there is a special hell in Dante for those righteous people that have to mete out justice." Both claims, however, are without merit. As to the former, it is difficult to perceive how counsel's statement that Hicks would not be eligible for parole until he was at least eighty years old prejudiced him in any way. At a minimum, such a statement can be said to fall with the ambit of *Strickland*'s "tactical decisions," which are "virtually unchallengeable." As to the second objection, Hicks's counsel was simply responding to earlier Biblical references made by the prosecution. Such assistance may not be said to be "ineffective."

### 5. Ineffective Assistance of Appellate Counsel

For reasons previously addressed, Hicks's claim of ineffective assistance of appellate counsel is procedurally defaulted.

### B. Prosecutorial Misconduct

On habeas review, this court reviews claims of prosecutorial misconduct deferentially. *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). To be cognizable, the

---

[9]The case law, albeit scant, suggests that such commentary may be acceptable. *See., e.g., Andrews v. Deland,* 943 F.2d 1162 (10th Cir. 1991), overruled in different part by *Daniels v. United States,* 254 F.3d 1180 (10th Cir. 2001); *Andrews v. Barnes,* 743 F. Supp. 1496 (D. Utah 1990).

misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Even if the prosecution's conduct was improper or even "universally condemned," *id.,* this court can only reverse if the statements were so flagrant as to render the entire trial fundamentally unfair. If this court finds a statement improper, four factors are considered in determining whether the impropriety is flagrant: "(1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial." *Bowling*, 344 F.3d at 512-13.

Hicks complains that the State's closing argument improperly urged the jury to act as the community's conscience. Particularly, he cites the prosecution's statements that "it is time you sent a message to the community" and "the people in the community have the right to expect that you will do your duty." These statements were arguably proper general references to the societal need to punish guilty people, rather than an improper "attempt to compare or to associate the defendant with a feared and highly publicized group . . . ." *Id.* at 516-517.

Contrary to the prosecutor's statements in *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991), the "community conscience" statements at issue here were not "calculated to incite the passions and prejudices of the jurors . . . ." In *Solivan*, the prosecutor's statements regarding the societal need to punish drug traffickers, such as defendant, was so gross as to probably prejudice her. The *Solivan* Court repeatedly referred to the "War on Drugs," which was a popular topic in this country at the time of defendant's trial. *See id.* at 1153-57 ("The statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric

of our society."). Conversely, in the instant appeal and as just indicated, the prosecutor's statements only referred to "the general community need to convict guilty people." *Id.* at 1155. More importantly, such statements "were devoid of the sort of inflammatory content inherent in the prosecutor's statements in [*Solivan*] precisely because there was no comparable specific wider context of national attention and concern" here regarding the conviction of double-murderers like Hicks. *See id.* at 1154-55. *Solivan* is inapposite – it is untenable to suggest that the prosecutor's statements were directed to the jurors' desire to end a social problem. *Cf. id.* at 1153. These remarks were not misleading, inflammatory, or prejudicial. Assuming *arguendo*, however, that there was error, it was only harmless since the evidence of Hicks's guilt was overwhelming. *See id.* at 1156 (prosecutorial error may be held harmless "in light of the relative strength of the evidence"). The prosecutor's remarks were isolated and not so improper as to render the trial fundamentally unfair. *Bowling*, 344 F.3d at 512-13.

## C. Claims Procedurally Defaulted

Hicks procedurally defaulted the following prosecutorial misconduct claims by not asserting them on direct appeal. Rather than challenging this determination, he asserts ineffective assistance of appellate counsel as cause for excusing the default. As addressed above, this is not proper cause and the claims are defaulted; regardless, the defaulted claims are analyzed below. Hicks still loses on the merits because, for every claim, either the prosecution's act was not improper or was not flagrant enough to result in enough prejudice to render the entire trial fundamentally unfair.

### 1. Failure to Disclose Statements

Hicks claims that, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and Ohio Criminal Rule 16(B)(1)(a)(ii), the prosecution failed to provide him with inculpatory statements he made to Cincinnati police officers. During the

guilt phase of Hicks's trial, Officer Hennekes testified on cross-examination that during an interview between him, Officer Hoffman, and Hicks, he asked what Hicks thought would happen as a result of the murders. Hicks allegedly responded, "They will probably give me the electric chair." Officer Hennekes then asked, "Don't you think you should get the electric chair for what you did?" Hicks responded, "Yeah, I do." This was the first time defense counsel learned of these statements. Upon completion of this testimony, Hicks moved for a mistrial premised upon the prosecution's failure to comply with his pretrial discovery request, which the trial court denied. Hicks's counsel never requested that the testimony be stricken from the record or for an admonition to the jury to disregard the testimony.

Officer Hoffman's notes of Hicks's interview do not includes these statements. Both parties agree that this information was not given to the defense prior to trial; however, the prosecution could not recall if it was aware of these statements prior to trial. Officer Hennekes's testimony is the only evidence that Hicks uttered these statements. Hicks insists that these statements "were inherently and inordinately prejudicial because they conveyed to the jury Hicks'[s] apparent acquiescence in the correctness of a recommendation of death as the appropriate penalty in his case."

To the extent Hicks premises his argument upon Ohio Criminal Rule 16(B)(1)(a)(ii), there is no constitutional violation cognizable on habeas. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *see* 28 U.S.C. § 2254(a) (habeas corpus proceedings may be entertained only if Hicks "is in custody in violation of the Constitution or laws or treaties of the United States"). To the extent that Hicks states an alleged constitutional violation under *Brady*, however, he was denied a fair trial only if the prosecutorial misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of [his] trial," or "so gross as probably to

prejudice [him]." *United States v. Vance*, 871 F.2d 572, 577 (6th Cir. 1989) (citations omitted).

*Brady* requires that the government turn over evidence in its possession to the defense that is both favorable to the accused and material to guilt or punishment. 373 U.S. at 87. Pursuant to *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue." *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001).

There is no *Brady* violation here since there is no evidence that the prosecution knew of Hicks's statements before trial. These statements were elicited during Hicks's cross-examination of Officer Hennekes, not on direct examination by the prosecution. Moreover, as Hicks allegedly uttered these statements, he knew whether he made them and could have advised his counsel accordingly. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) ("[N]o *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question . . . ."). Although Hicks claims that the statements were material to his punishment, *i.e.*, that he believed the death penalty was the appropriate penalty for his crimes, he was not sentenced to death for both murders. Hicks's belief that he would be sentenced to death is also consistent with his expression of remorse during the penalty phase of his trial. Hicks was not denied a fair trial because the result of the proceeding would not have been different.

## 2. Use of Confidential Arrest Records

During voir dire, the prosecution used records of outstanding warrants and convictions of prospective jurors. Hicks's counsel raised the issue during voir dire but the

prosecution responded that it had obtained these records through its investigators and Hicks could have done the same. The prosecution acknowledged that it was its practice to have investigators or police officers conduct record checks of prospective jurors, particularly in high profile cases. Based upon the information in these records, during voir dire the prosecution twice made reference to the non-felonious criminal history of prospective jurors and, after the prosecution's challenge for cause was denied, exercised a peremptory challenge to remove one juror. While Hicks concedes that "it is difficult to say that the prosecution'[s] use of this information to strike certain potential jurors effected the verdict or sentence, it is clear that the inability to access the information jeopardized [his] right to a fair trial."

This claim fails. Convictions are public record. *State v. Cook*, 700 N.E.2d 570, 579 (Ohio 1998). Although the prospective jurors' arrest records may or may not constitute confidential law enforcement investigatory records, *see State ex rel. Outlet Communications, Inc. v. Lancaster Police Dep't*, 528 N.E.2d 175, 178 (Ohio 1988) (in context of O.R.C. § 149.43(A)(2)(a)), outstanding warrants are not public record. Nevertheless, any distinction is irrelevant – while Hicks makes the general allegation that he was deprived "of the kind of fact-finder to which he [is] constitutionally entitled[,]" *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975), and references two cases from other jurisdictions indicating that the prosecution must disclose prospective jurors' arrest records to the defense, he cannot demonstrate how this prosecutorial impropriety deprived him of a fair trial. Considering the overwhelming evidence of Hicks's guilt, the fact that no evidence was presented indicating that the prosecution obtained the records in violation of either state or federal law, his failure to show that the records affected the jury's verdict or sentencing recommendation, and his own concession, the prosecution's conduct was not "so egregious as to render [his] trial fundamentally unfair." *Buell v. Mitchell*, 274 F.3d 337, 364 (6th Cir. 2001) (citations omitted); *see also Weatherford v. Bursey*, 429 U.S. 545, 559

(1977) ("There is no general constitutional right to discovery in a criminal case . . . .").

### 3. Victim Impact Statements

Hicks complains of prosecutorial victim impact statements that appealed to the jury's emotions at both the guilt and penalty phases of the trial. Generally, the statements play on Brandy's young age, Maxine's handicap, and the idea that the murders destroyed a whole family.[10] While the State answers that the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), sanctioned the use of victim impact statements, *Payne* simply dealt with the sentencing phase. Nevertheless, this court has approved victim impact evidence during the guilt phase, rather than at sentencing, as an extension of *Payne. See Cooey v. Coyle*, 289 F.3d 882, 921 (6th Cir. 2002).

Hicks cites *State v. McNeill*, 700 N.E.2d 596 (Ohio 1998), for the proposition that the Ohio Supreme Court has limited the admission of victim impact evidence to rebuttal of offered mitigation. Since this limitation is an Ohio rule of procedure rather than a constitutional argument, *see id.* at 606, it provides no habeas relief. In any event, there was no prejudice because the statements were not "so pronounced and persistent" that they "permeate[d] the entire atmosphere of the trial . . . ." *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997). The statements were isolated, not extensive, and the proof of guilt was overwhelming.

---

[10]During the trial, the prosecution referred to "Little Brandy Green" as being five years old, her parrot named "Pierre," and to Maxine as "a cripple." During closing argument, the prosecution brought up that Hicks "destroyed an entire family" and invited the jury to imagine what went through Brandy's mind.

### 4. Prosecution's Isolated Comments

Hicks first complains that, during its opening statement, the prosecution implied his guilt by emphasizing the importance of the indictment. When read in context, the prosecution was only reading the charges. Even if this was somehow improper, it was an isolated statement, the evidence of guilt was overwhelming, and the trial court gave an instruction that the indictment was not evidence. *See United States v. Bond*, 22 F.3d 662, 668 (6th Cir. 1994) (finding prosecution's reference to indictment did not imply guilt and that instruction cured any possible error).

Hicks next complains that the prosecution told the jury that the trial court did not believe his intoxication or insanity defenses. These comments concern the prosecution's statements that the trial court would not give an instruction on intoxication/insanity because of the lack of supporting evidence. This claim fails for two reasons. First, the Ohio Supreme Court has approved these types of statements. *See State v. Smith*, 780 N.E.2d 221, 234 (Ohio 2002) (finding "it was permissible for the prosecutor to point out to the jury that the evidence did not warrant such an instruction" on intoxication). Second, both intoxication and insanity are affirmative defenses in Ohio. *See State v. Rupp*, No. CA2001-06-135, 2002 WL 517968, at *6 (Ohio Ct. App. Apr. 8, 2002) (intoxication);[11] *State v. Filiaggi*, 714 N.E.2d 867, 878 (Ohio 1999) (insanity). Even if the statements improperly intimated that the trial court believed that the affirmative defenses were meritless, *see United States v. Sullivan*, 919 F.2d 1403, 1425 (10th Cir. 1990), they came during the guilt phase. Thus, even if improper, the comments regarding the intoxication/insanity instruction were not prejudicial since the evidence of guilt was overwhelming.

---

[11]Although *Rupp* explained that voluntary intoxication is no longer an affirmative defense, it was available as an affirmative defense on the date of Hicks's offenses. *See supra*, n.5.

Hicks also complains that the prosecution suggested that his defense counsel had "no doubt" that he was guilty and that they knew he committed these "very dastardly acts." While it is generally improper for the prosecution to imply that defense counsel thinks the defendant is guilty, *see generally* Gregory G. Sarno, Annotation, *Propriety and Prejudicial Effect of Prosecutor's Argument Giving Jury Impression that Defense Counsel Believes Accused Guilty*, 89 A.L.R.3d 263 (1979), defense counsel did say "the evidence is going to show . . . he committed these dastardly acts." Thus, the claim fails.

## 5. Additional Comments

Hicks's claim that the prosecution improperly brought attention to the fact that his mitigation statement was unsworn fails because the prosecution may properly comment that a defendant's mitigation statement is unsworn. *DePew v. Anderson*, 311 F.3d 742, 745 (6th Cir. 2002). Hicks also complains that, during voir dire, the State miscast the jury decision as only a recommendation, causing the jury to think it had a watered-down role in imposing death in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) (holding prosecutor's argument that jury's decision was not final because of appellate review was improper because it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). Since Ohio law requires a separate, post-recommendation finding by the trial judge confirming the jury's sentence, this court has held that casting the jury's decision as a "recommendation" is not an inaccurate statement of Ohio law and therefore does not violate *Caldwell*. *Coleman*, 268 F.3d at 436.

Similarly, Hicks charges the prosecution violated *Caldwell* by identifying three sources of responsibility for Hicks's death sentence: (1) Hicks himself, (2) the people of Ohio for

authorizing the death penalty, and (3) "fate, God, a deity or something who has determined that there will be a just punishment for this man." *Caldwell* stands for the proposition that the jury should not feel less responsible, or more free to err, because of a belief that its decision to impose death will not have effect unless others later confirm the decision. Here, all three of the complained sources have to do with previous authorization, not further review or confirmation as in *Caldwell*.

Nevertheless, the third source, "God," is problematic on separate religious grounds. Courts universally condemn religious injections. *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001). However, again, the prosecutor's reference was one isolated statement and it is doubtful a jury would have felt a diminished responsibility by an ambiguous reference to "fate, God, a deity or something." Plus, the court gave the standard instruction that what the lawyers say is not evidence. *See Bennett v. Angelone,* 92 F.3d 1336, 1346-47 (4th Cir. 1996) (finding lack of prejudice because of standard instruction). This is not a case where the prosecutor quoted at length from Scripture about God mandating death. *See Sandoval*, 241 F.3d at 775-80. There was no prejudice.

Hicks further maintains that the prosecution, during closing argument, reviewed all mitigating factors listed in the statute, including those not raised by the defense. This was improper, as we have held that mitigation issues not brought up by the defense cannot be brought up by the State because it impermissibly focuses the attention on the absence of mitigating factors. *Combs*, 205 F.3d at 292. While it may be one of the more meritorious of all Hicks's claims, it fails for lack of prejudice. It does not appear that any court has ever found prejudice on a *Combs* claim. Moreover, the prosecution simply laid out all the mitigating factors and argued why they did not apply. The prosecution did not "mischaracterize[] a potentially mitigating factor as an aggravating factor . . . ." *Turner v. Calderon*, 281 F.3d 851, 870 (9th Cir. 2002). "Given the particularly savage nature"

of these murders and "the few mitigating factors presented by" Hicks, there was an "overwhelming balance of valid aggravating evidence" and therefore no reasonable possibility that the *Combs* violation affected the penalty verdict. *See id.* at 869-70.

Last, Hicks complains that the State impermissibly turned the nature of the crime into an aggravating factor. Although the prosecution "may properly refer to the nature and circumstances of the offense, it is improper to characterize that evidence as a nonstatutory aggravating circumstance." *Combs*, 205 F.3d at 292. Despite Hicks's claim, as the prosecution never told the jury that it could consider the nature of the crime as an aggravating factor, this claim fails.

### 6. Peremptory Strikes

Hicks finally argues that the prosecution's use of peremptory challenges to exclude jurors who opposed the death penalty denied him an impartial jury. This claim is without merit because Hicks confuses those cases where jurors were improperly *stricken for cause*. As long as not based on race or gender, peremptory challenges are proper. *Dennis v. Mitchell*, 354 F.3d 511, 525 (6th Cir. 2003) (upholding peremptory challenges based on opposition to death penalty).

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

### CONCURRING IN PART, DISSENTING IN PART

CLAY, Circuit Judge, concurring in part and dissenting in part. Contrary to the majority's disposition, prosecutorial misconduct in the state court trial should entitle Petitioner to a new mitigation phase trial.[1] Due to the overwhelming evidence of guilt, Petitioner is not entitled to a new guilt phase trial. I will first explain how the prosecution made numerous statements that were improper on various separate grounds, and secondly will explain why this was prejudicial.

### I.

The prosecution repeatedly violated three rules during the closing argument of the guilt phase of the trial–which will be made clear after the applicable rules are set forth.

*First*, this Court has stated that "appeals to the jury to act as the community conscience" are *per se* impermissible, when "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). The prosecution has a right to cast the defendant as a villain, but the prosecution may not pressure the jury to uphold its role as righteous executioners–and the prosecution is strictly forbidden from suggesting to the jury that harsh treatment of one particular defendant will help to solve a larger societal problem. The specific societal issue in *Solivan* was the use of drugs.

*Second*, under *Darden v. Wainwright*, 477 U.S. 168, 179-81 (1986), the prosecution is prohibited from arguing for the

---

[1]Because I believe that prosecutorial misconduct is the dispositive issue, I do not take a position on any of the other issues raised in this case, except to say that no issue warrants a new guilt phase trial.

death penalty during the guilt phase of the trial. Commingling the guilt phase with the capital sentencing question encourages the jury to view the case as a single entity; in a case, such as this one, with overwhelming evidence of guilt, the jury is discouraged from drawing a distinction between its guilt phase trial verdict and its sentencing recommendation. The prosecutor gains an unfair advantage by getting a head start on his argument for the death penalty, which causes the jury[2] to enter the mitigation phase of the trial with preconceptions as to sentencing.

*Third*, when addressing the jury, "[t]he prosecutor has a duty not to misrepresent the law . . . ." *Hung Thanh Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002); *see also United States v. Ollivierre*, No. 03-4802, 2004 U.S. App. LEXIS 16681, at *12 (4th Cir. Aug. 13, 2004) (published).

During the closing argument of the guilt phase of the trial, these three rules were violated continually and to an extreme degree. In numerous instances in the closing argument of the guilt phase trial, prosecuting attorney Claude N. Crowe repeatedly, and over objection, argued for a death sentence, pressuring the jury to serve as a community conscience by sentencing Petitioner to death, to send a message to the community regarding the larger societal problem of drug use.

Early in the closing argument of the guilt phase trial, Crowe began arguing that a death sentence would send a message to the community that would deter cocaine use:

MR. CROWE: We are trying to take this man's life.

MR. RUEGER [HICKS' COUNSEL]: Objection, your Honor, that has no place in this particular matter.

---

[2]The same jury serves in both the guilt and sentencing phases. Ohio Rev. Code § 2929.03(D)(2) ("the trial jury" is responsible for capital sentencing recommendations).

THE COURT: This Court leaves a lot of latitude in final argument. The jury knows what the evidence is and the Court will instruct the jury on the law. Proceed.

MR. CROWE: . . . We all said the death penalty serves a purpose. Some of you have said retribution is a valid reason, some of you said deterrent.[[3]] I ask you, ladies and gentlemen, it is time you sent a message to the community. That this is no excuse.

MR. RUEGER: Judge, I object to that this is highly improper and I have to make a motion for a mistrial.

THE COURT: The objection is sustained. The motion for a mistrial is denied.
     Proceed, Mr. Crowe.

MR. CROWE: Consider deterrents [sic–deterrence] . . . when you think about cocaine, the devil the cocaine.

(J.A. at 2779-84.)

Crowe's statements here urged the jury to recommend a death sentence for the purpose of "sen[ding] a message to the community" that drug use will not be tolerated, i.e., a message of "deterrence" regarding "the devil cocaine." Crowe urged the jury to "sen[d] a message to the community," by "tak[ing] [Petitioner's] life." Crowe was not asking the jury to send a message that would deter murder; he was not arguing that sentencing Petitioner to death would send any general message of deterrence to potential murderers, whose possible crimes may involve vastly different types of victims, motivations, and circumstances. What Crowe wanted was a message that would deter cocaine use. Sentencing a cocaine user to death, for a murder that was inextricably tied to cocaine use–Petitioner was intoxicated by

---

[3]The prosecution referenced *voir dire*, here.

cocaine at the time of both murders, and the first murder was motivated by the desire to steal money that would be used to buy more cocaine–would "sen[d] a message to the community" that the penalties for cocaine use can be extremely severe. This is the "deterrence" that Crowe clearly referenced, when he said: "Consider deterrents [sic–deterrence] . . . when you think about cocaine, the devil the cocaine."

Crowe's statements regarding sending a message to deter cocaine use were highly improper. In *Solivan*, this Court remanded the case for a new trial, based upon the prosecutor's similar drug deterrence argument. In that case, the prosecutor argued, in his closing statement, "*I'm asking you to tell her and all of the other drug dealers like her*—(defense counsel's objection and Court's response omitted)—*[t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . . .*" 937 F.2d at 1148 (emphasis in original). Crowe's statements about addressing the community-level problem of drug use were directly in violation of *Solivan*. If Crowe's statements were slightly less outrageous than those in *Solivan*, then Crowe's rhetoric was also far more impassioned, referencing "the devil cocaine." Here, as in *Solivan*, the attempt to use the particular case before the jury to address the larger societal problem of drug use constituted "an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could have only been to arouse passion and prejudice." *Id.* at 1151 (characterizing *Viereck v. United States*, 318 U.S. 236, 237-38 (1943)).

In improperly urging the jury to act as the community conscience by using this particular case to promote "deterrence" of cocaine use, Crowe misrepresented the law to the jury. In *Solivan*, the prosecutor's comments were improper solely because they urged the jury to serve as the community conscience. But the comments in *Solivan* did not misstate the law–the jury was authorized to punish the defendant for drug trafficking because the charged offenses

were drug crimes. By contrast, in the instant case, Petitioner was not charged with any drug offense. Crowe's deterrence argument asked the jury to treat Petitioner harshly, so as to send a message that would deter cocaine use; this request to impose a harsh sentence based upon cocaine use carried with it the necessary and obvious implication that under Ohio law a jury is authorized to consider drug use as an aggravating factor in sentencing for a capital crime. This implication was patently false. Under Ohio law, the jury is not permitted to consider drug use as an aggravating factor in capital sentencing. Ohio's capital sentencing scheme contains a finite list of aggravating factors, and cocaine use (or the use of other drugs or alcohol) is not one of them. Ohio Rev. Code § 2929.04(A). Crowe misrepresented the law to the jury, by indicating that a death sentence could be justified, in part, by Petitioner's use of cocaine.

This misrepresentation of Ohio law was extensive. Crowe continually attempted to draw the improper, unfounded implication that cocaine use can be an aggravating factor in capital sentencing. Later in the closing argument of the guilt phase trial, Crowe again repeatedly referenced the jury's alleged duty to send Petitioner to death, at least in part due to his drug use:

> I don't want there to be any question in your mind what your duty is in this case. There was no question in his mind what he wanted the result to be [in committing the murders]. And I tell you, ladies and gentlemen, he forfeited his right to life at that point in time. All for devil cocaine. The devil cocaine is not a defense. . . .
>
> As difficult as it may be to face what must be done in this case . . . .
>
> . . . .
>
> The people in this community have the right to expect that you will do your duty.

(J.A. at 2788-92.)

Crowe was improperly arguing that "the devil cocaine" could be considered as a reason for the jury to conclude that Petitioner "forfeited his right to life." Crowe may have tried to clean up his language by mentioning that cocaine intoxication is not a defense.[4] But by the time he said this it was too late–Crowe had just finished drawing the link between cocaine use and the death sentence. Moreover, soon after referencing the fact that cocaine intoxication was not a defense, Crowe returned to his message that a death sentence was appropriate–urging jurors to do "what must be done," their "duty," even though it would be "difficult." Needless to say, Crowe was urging jurors to recommend a death sentence. (There is nothing "difficult" about merely finding a defendant guilty of crimes to which he had confessed.) This intimation that the "devil cocaine" could be considered as a reason to recommend a death sentence was a misrepresentation of Ohio law.

Crowe used this particular case as a vehicle to further the larger social agenda of drug deterrence. Based upon Crowe's arguments, the guilt phase was not about determining Petitioner's guilt–it was about something more, i.e., achieving a death sentence. And the sentence was not solely about punishment–it was about something more, i.e., condemnation of "the devil cocaine." Because Crowe obviously saw his ultimate goal of deterring cocaine use as extremely important, the ends justified the means, resulting in a misrepresentation of the law, i.e., Crowe's encouraging the jury to consider cocaine use as an aggravating factor in sentencing. Each of

---

[4]Crowe was, of course, entitled to refute the argument that cocaine intoxication was a defense; Crowe was entitled to argue that the effects of cocaine use had not diminished Petitioner's capacity to act purposely, with intent, under the definition of aggravated murder. Ohio Rev. Code §§ 2901.22(A) (definition of "purposely"), 2903.01(A) (*mens rea* for aggravated murder).

Crowe's breaches of the rules appear to fit together as part of the larger plan.

Crowe characterized the central issue in this case as being that of cocaine use; cocaine was the aggravating circumstance that could convince the jury to recommend a death sentence. During the closing argument of the guilt phase trial, when Crowe began to refute the cocaine defense, Crowe characterized Petitioner's mindset as follows: "The most important thing is craving for more cocaine. Well, that is right. The most important thing in his life is the craving of cocaine and not the well being of other human beings." (J.A. at 2788.) These comments did not refute the defense of cocaine intoxication. If anything, the comments *supported* the defense of cocaine intoxication by twice referring to the "craving" of cocaine. Such language could have suggested that Petitioner had lost control at the time of the crimes and lacked the requisite *mens rea*. Clearly, Crowe was not discussing guilt; he was trying to convince the jury to recommend a death sentence. When Crowe said, "The most important thing in his life is the craving of cocaine and not the well being of other human beings," this statement was not limited to Petitioner; the statement was an indictment of cocaine users, generally. In Crowe's view, the use of cocaine was "a conscious decision which *they* make." (J.A. 2783-84) (emphasis added). "They"–cocaine users, generally–were on trial, not just Petitioner.

Crowe saw the case quite clearly. This was the opportunity to "sen[d] a message" to potential users of "the devil cocaine," that "they" would be held accountable. Drug convictions do not carry death sentences; thus they offer less of an opportunity to make an example of a defendant. But this case was different. This was a referendum. The next time a potential user felt a "craving" for cocaine, he would think twice before making the "conscious decision" to use the drug–he would realize that the drug had caused Petitioner to "forfeit[] his right to life." The goal of the trial was not to find the facts but rather to "try[] to take [Petitioner's] life," in

the service of a higher purpose–"deterrence" of cocaine use. The "community ha[d] the right to expect that" jurors would do their solemn "duty," to help win the war on drugs.

Crowe's pervasive message was highly improper in attempting to invoke the community conscience to such a degree. But what made the conduct especially egregious was that Crowe overstepped the boundary between the guilt and mitigation phases by encouraging the jury to prejudge the sentencing decision before Petitioner's attorney had the opportunity to address the penalty issue. By so doing, Crowe pressured the jury to ignore governing Ohio law under which drug use cannot be considered as an aggravating factor in capital sentencing. Crowe violated certain clear, fundamental rules that constrain prosecutorial advocacy.

The attempt to invoke improper considerations did not end with the guilt phase. During the closing argument of the penalty phase, Crowe's colleague, John J. Arnold stated, "It is the people of the State of Ohio who have determined that in a case such as this death may be an appropriate decision. And finally I suppose it is – I don't know if you want to call it fate, God, a deity or something who has determined that there will be a just punishment for this man." (J.A. at 2924.) The majority acknowledges that this violated Petitioner's fundamental constitutional rights. *Sandoval v. Calderon*, 241 F.3d at 776 ("In a capital case like this one, the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment . . . ."). Taken alone, Arnold's statement could be overlooked. But the comment must be viewed as part of the prosecution's improper continuing attempt to sermonize about the larger purposes and ideals that would be served by Petitioner's receiving a death sentence.

## II.

The prosecution's improper statements were prejudicial. The standard for prejudice is whether the improper remarks were "harmless beyond a reasonable doubt," i.e., whether there is a "reasonable possibility" that the error might have contributed to the result being challenged. *Solivan*, 937 F.2d at 1155.

There is no need to answer the question of whether any of the prosecution's improper remarks might have been prejudicial, taken individually. Individual instances of prosecutorial misconduct can be cumulated.[5] (Actually, *different types* of constitutional errors can even be cumulated, in a capital case;[6] but the prosecutorial misconduct issue in the instant case need not rely on that rule.)

In *DePew v. Anderson*, in cumulating numerous errors to vacate a death sentence, this Court made clear that in capital cases it is more difficult for the prosecution to demonstrate a lack of prejudice:

Members of the Supreme Court have advised us to remember that "death is different"–that "[t]he taking of life is irrevocable," so that "[i]t is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights," *Reid v. Covert*, 354

---

[5] *Lundy v. Campbell*, 888 F.2d 467, 474-75 (6th Cir. 1989) (citing *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc)). *See also United States v. Young*, 470 U.S. 1, 11 (1985) ("the prosecutor's remarks, when viewed within the context of the entire trial"), 12 ("the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error").

[6] In *DePew v. Anderson*, constitutional errors that might have been harmless, taken individually, were cumulated by this Court, leading to a reversal of a death sentence. 311 F.3d 742, 751 (6th Cir. 2002).

U.S. 1, 45-46, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Frankfurter, J., concurring), and that "[i]n death cases doubts . . . should be resolved in favor of the accused." *Andres v. United States*, 333 U.S. 740, 752, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). In *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Court decided that a prosecutor's prejudicial statements in closing argument rendered the death sentence invalid. It applied a stricter standard in assessing the validity of closing argument in death cases relying on the Court's admonition in *California v. Ramos*, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny in capital sentencing determinations."

311 F.3d 742, 751 (6th Cir. 2002).

Under the heightened scrutiny in a capital case that *DePew* requires, the prosecution's improper statements prove prejudicial when viewed cumulatively. There is a reasonable possibility that the jury's sentencing recommendation was influenced by the improper statements; this can be demonstrated by virtue of comparison with *Solivan*.

In *Solivan*, this Court reversed convictions and sentence and remanded the case for new trial because improper prosecutorial remarks had been prejudicial. A comparison reveals that, on all accounts, Petitioner's case for granting a new mitigation phase trial is either comparable to or stronger than the argument for a new trial in *Solivan*. Here, as in *Solivan*, the improper remarks were "calculated to incite the passions and prejudices of the jury." 937 F.2d at 1151. In *Solivan*, there was only one statement appealing to the community conscience. In the instant case, as recounted above, there were numerous separate statements appealing to community conscience. In *Solivan*, as in the instant case, the prosecution improperly suggested that the jury use the case to

send a message of deterrence regarding the larger societal problem of illegal drug use.

The *Solivan* Court considered the inflammatory nature of the comments made by the prosecution and also "[b]oth the timing and the firmness of the trial court's" curative instruction. 937 F.2d at 1157. The *Solivan* Court noted that there was a substantial delay before the trial judge offered a curative instruction–after the objection, there was a conference between the trial judge and the attorneys for both sides–and there was no firm rebuke by the trial judge. *Id.* Because each of these factors suggested prejudice, the error could not be deemed harmless. *Id.* In the instant case, there were *never any* curative instructions; after sustaining an objection regarding Crowe's call for the jury to "sen[d] a message to the community," the trial judge simply allowed Crowe to proceed with his closing argument. Additionally, as explained above, in the instant case–but not in *Solivan*–the prosecutor misstated the law (by suggesting that drug use could factor into the sentencing recommendation). Finally, *Solivan* was not a capital case; thus, *DePew*'s heightened scrutiny of prejudice in a capital case was not applicable in *Solivan*.

Overall, then, there is nothing in *Solivan* that would weigh more strongly in favor of post-conviction relief than the circumstances in the instant case. And at least four factors suggest prejudice more strongly in the instant case than in *Solivan*: (1) the appeals to community conscience were more numerous in the instant case than in *Solivan*; (2) the trial judge offered no curative instructions in the instant case, as opposed to a delayed curative instruction in *Solivan*; (3) unlike *Solivan*, the instant case involved misrepresentation of law to the jury; and (4) unlike *Solivan*, the instant case is a capital case.

*Solivan* makes clear that strong evidence of guilt can provide a reason for a finding that improper prosecutorial

statements were harmless. 937 F.2d at 1156.[7] Yet this principle cannot be applied to demonstrate a lack of prejudice in the instant case. In *Solivan*, the prosecutorial misconduct was so egregious that the conviction–i.e., the jury's fact-finding–was reversed. In the instant case, where the impropriety was worse than in *Solivan*, for the above-mentioned reasons, in sentencing the jury was required not merely to engage in objective fact-finding but rather to *weigh* aggravating and mitigating factors. There is no basis for speculating that the jury's weighing function was unaffected by the prosecution's polemics.

Under Ohio law, the prosecution has "the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." Ohio Rev. Code § 2929.03(D)(1). The jury is not permitted to recommend a death sentence unless it "unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors." *Id.* § 2929.03(D)(2). The death penalty cannot be imposed in Ohio, unless the jury has given its unanimous recommendation. *Id.* Hence, synthesizing all of the applicable standards, all that is needed to show prejudice is the demonstration of a reasonable possibility that, absent the improper statements, at least one juror would have declined to find that the prosecution had proved beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors.

The jury was presented with various forms of mitigation evidence in this case. In its review of the case, the Supreme Court of Ohio explained that at sentencing Petitioner had presented numerous pieces of evidence that were relevant to

---

[7] Due to the overwhelming evidence of guilt, including Petitioner's police confession, the result of the guilt phase trial need not be disturbed.

mitigation. The Supreme Court of Ohio pointed out that Petitioner "turned himself in, waived extradition, and cooperated with police. This factor tends to show remorse . . . ." *State v. Hicks*, 538 N.E.2d 1030, 1039, 43 Ohio St. 3d 72, 80 (Ohio 1989). In addition, contrary to Crowe's representations to the jury that cocaine use was an aggravating factor (i.e., Crowe's deterrence argument), the Supreme Court of Ohio considered the cocaine use to be a mitigating factor. *Id.* ("The possibility that appellant was under the influence of drugs when he killed his victims should be assigned some weight in mitigation.").[8] Also, the Supreme Court of Ohio noted that various other types of mitigation evidence had been presented, including evidence that Petitioner had a learning disability, evidence of Petitioner's troubled childhood in which his father had possibly been an alcoholic, and evidence of Petitioner's reputation among co-workers as having good character and a strong work ethic. *Id.*

---

[8] The court considered cocaine use to be relevant to at least one of the mitigation factors. The court may have reasoned that cocaine addiction was "a mental disease or defect" that caused a criminal to "lack[] substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Ohio Rev. Code § 2929.04(B)(3). In the alternative, cocaine use could be considered under the residual catch-all provision for mitigating factors. *Id.* § 2929.04(B)(7) ("Any other factors that are relevant to the issue of whether the offender should be sentenced to death" may be considered to the extent that they "weigh against the aggravating circumstances").

At sentencing, Crowe had the right to refute the argument that cocaine use should be a strong mitigating factor. But such refutation could only occur after Petitioner's counsel had made the mitigation argument. Instead, Crowe preempted Petitioner's counsel, by raising the topic of sentencing during the guilt phase trial, before Petitioner's counsel had made any mitigation argument. Thus, Crowe's message could not be interpreted as a rebuttal of a mitigation factor. During the guilt phase trial, Crowe was not refuting the notion that cocaine use provided a justification for a less harsh sentence. Crowe's guilt phase trial argument as to deterrence was a clear message that the cocaine use was a reason to treat Petitioner *more harshly*. It was improper to make this argument, because under Ohio law there is no aggravating factor that could possibly be construed to include cocaine use.

In light of the presentation of mitigation evidence, there is no basis for a determination that the prosecution's extensive improper statements did not influence the jury in a function, the weighing of factors, that is inherently discretionary. To weigh aggravating and mitigating factors, the jury must decide what relative value to assign to each factor. The prosecution's comments advocated improper values for jurors to use, in their weighing function. Crowe forcefully pushed the jury to value the community's stake in deterrence of cocaine use, in sentencing a defendant who was not being tried for a drug crime. The trial judge gave no curative instructions to blunt the impact of these improper remarks. Given the extensive nature of Crowe's improper statements, a conclusion that there was no prejudice here would require more speculation than *DePew* permits in a capital case.

## CONCLUSION

For the aforementioned reasons, I respectfully dissent as to the issue of prosecutorial misconduct, and I would vacate and remand for a new mitigation phase trial. Due to the overwhelming evidence of guilt, I concur that the improper prosecutorial statements did not prejudice Petitioner in the guilt phase of his trial, and thus I would affirm the district court's denial of a new guilt phase trial.