**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0014n.06
Filed: January 8, 2007

**04-3301**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MELVIN BONNELL,               )
                              )
    Petitioner-Appellant,     )
                              )
v.                            )     ON APPEAL FROM THE UNITED
                              )     STATES DISTRICT COURT FOR THE
BETTY MITCHELL,               )     NORTHERN DISTRICT OF OHIO
                              )
    Respondent-Appellee.      )


Before: DAUGHTREY, GILMAN, and SUTTON, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. The petitioner, Melvin Bonnell, is a prisoner on Ohio's death row, having been convicted of aggravated burglary and capital murder in the death of Robert Eugene Bunner in November 1987. Following the unsuccessful exhaustion of his remedies in state court, Bonnell filed a petition for a writ of habeas corpus in federal district court but was denied relief there as well. He now appeals the district court's judgment, contending (1) that the state improperly suppressed exculpatory evidence, (2) that the district court erred in denying him discovery and an evidentiary hearing on his allegations of suppression and destruction of such exculpatory evidence, (3) that the prosecution failed to correct materially false testimony at trial, and (4) that the prosecution was guilty of misconduct throughout the trial. Because the

certificate of appealability that creates our jurisdiction to review the district court's judgment does not cover the second issue, we must confine our review to the remaining three issues. As to them, we find no reversible error on the part of the district court, and we therefore affirm the decision denying relief to the petitioner.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

On direct appeal from Bonnell's conviction in state court, the Supreme Court of Ohio offered the following summary of the relevant evidence heard by the jury in this case:

> Shirley Hatch, Edward Birmingham and Robert Eugene Bunner shared an apartment on Bridge Avenue in Cleveland, Ohio. On November 28, 1987, at approximately 3:00 a.m., Hatch heard someone knock at the kitchen door of the apartment. Hatch asked who was at the door and a voice replied, "Charles." Bunner opened the door and the appellant, Melvin Bonnell, entered the apartment and closed the door behind him. Appellant uttered an expletive directed at Bunner and then proceeded to fire two gunshots at Bunner at close range. Bunner fell to the floor and Hatch, who had witnessed the shooting, ran to a bedroom where Birmingham was sleeping. Hatch heard two more gunshots, awoke Birmingham to tell him that Bunner had been shot, and then fled from the apartment to call paramedics. Birmingham went to the kitchen.

> Upon entering the kitchen, Birmingham observed appellant who was on top of Bunner ". . . pounding him in the face." Birmingham also observed bullet holes in Bunner's body. Birmingham grabbed appellant and ejected him from the apartment.

> At approximately 3:40 a.m., two Cleveland police officers were patrolling Bridge Avenue in a police cruiser when they observed a blue vehicle being driven backwards on Bridge Avenue with its headlights off. The officers attempted to stop the vehicle, and a high-speed chase ensued when the driver of the vehicle failed to stop. During the chase, the officers never lost sight of the vehicle except, perhaps, for a few seconds. The officers never saw anyone in the vehicle except the driver. No one exited the vehicle during the chase. The chase ended when the driver of the blue

vehicle crashed into the side of a funeral chapel. The officers removed the driver from the vehicle and placed him on the ground. Both officers identified appellant as the driver of the vehicle.

Shortly after the accident, Cleveland police officers Stansic and Kukula arrived at the crash site and saw a man lying on the ground with police officers standing over him. However, officers Stansic and Kukula left the accident scene almost immediately thereafter in response to a radio call regarding the shooting at the Bridge Avenue apartment.

Upon arriving at the apartment, officers Stansic and Kukula interviewed Hatch and Birmingham who provided the officers with a description of Bunner's assailant. The officers recognized the witnesses' description as meeting the description of the man they had observed at the accident scene. The officers asked Birmingham to accompany them to the hospital where the man had been transported following the accident. At the hospital, Birmingham identified appellant as Bunner's assailant.

Bunner died as a result of a gunshot wound to the chest. An autopsy revealed that Bunner was shot twice, once in the chest and once in the pubic region. Both bullets were recovered from the body.

Police officers retraced the chase scene and found a .25 caliber automatic pistol which was later identified as appellant's. The weapon was test-fired and the test bullets were compared to the bullets found in Bunner's body. The test bullets and the bullets retrieved from Bunner's body had the same characteristics, and test casings matched spent bullet casings found at the murder scene.

Appellant was tried before a jury for the aggravated murder of Robert Bunner and for the commission of an aggravated burglary. The jury found appellant guilty on one count of aggravated burglary, one count of aggravated (felony) murder, and one count of aggravated murder for purposely, and with prior calculation and design, causing Bunner's death. In addition, appellant was found guilty of a death penalty specification in connection with each count of aggravated murder. For each count of aggravated murder, the trial judge, following the jury's recommendation, imposed a sentence of death. The court of appeals affirmed the convictions and death penalty.

*State v. Bonnell*, 573 N.E.2d 1082, 1084-85 (Ohio 1991).

The appellant was unsuccessful in securing relief on direct appeal, relief pursuant to his application for delayed reconsideration, or relief through state post-conviction procedures. He thus filed a habeas corpus petition in federal district court on March 1, 2000, raising 20 constitutional claims. The district court also denied relief to the petitioner and rejected Bonnell's requests for additional discovery and for an evidentiary hearing on his claims of prosecutorial destruction and suppression of exculpatory evidence. The court did, however, grant a certificate of appealability on six of the 20 claims raised in the habeas corpus petition, only three of which have been presented for review on appeal to this court.

## II. <u>DISCUSSION</u>

"This court reviews a district court's legal conclusions in a habeas proceeding de novo and its factual findings for clear error." *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)). Decisions by state courts on the merits of constitutional claims raised by the petitioner are, however, subject to a more deferential standard of review.

Because Bonnell filed his petition for issuance of the writ of habeas corpus on March 1, 2000, well after the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214 (1996), the provisions of that act govern the resolution of this dispute. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Greer*, 264 F.3d at 671. Pursuant to the provisions of AEDPA, a federal court may not grant the writ unless the state court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Moreover, in deciding whether a state court ruling involved an "unreasonable application" of federal law, a habeas court does not focus merely upon whether the state court decision was erroneous or incorrect; rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409-11.

**A. State Suppression of Material and Exculpatory Evidence**

In his first issue on appeal, petitioner Bonnell asserts that the State of Ohio failed to give pretrial notice of certain pieces of evidence that either tended to exonerate him or that cast doubt upon the veracity and credibility of prosecution witnesses. In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court imposed upon the prosecution in a criminal case the "obligation to turn over material that is both favorable to the defendant and material to guilt or punishment." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). "Moreover, it is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)). Nevertheless, a *Brady* violation will not result in a new trial for a criminal defendant unless the court concludes that the improperly withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

In this case, Bonnell alleges that the prosecution withheld from him police investigative reports that contained information that would have led the jury to a different verdict than the one it ultimately rendered. First, the petitioner insists that the state should have informed him whether gunshot residue tests performed on Bonnell's jacket and hands were positive or negative. According to the petitioner, a negative result on such laboratory tests would indicate that the petitioner did not fire the weapon that killed Eugene Bunner.

After trial, the defense did obtain a report from the Cuyahoga County Coroner's Laboratory confirming that "no reaction" was detected when Bonnell's jacket was tested for the presence of nitrites. Without question, had such results been shared with the defense team prior to trial, counsel could have advanced the argument that a negative test result for gunshot residue proved that Bonnell was not involved in the shooting. A member of the Cuyahoga County Trace Evidence team testified, however, that a negative gunshot residue test result is not necessarily indicative of a lack of contact with a weapon. As explained by the witness:

> On this particular individual I did not have any reaction for lead or barium. This simply means that the laboratory does not have any indications that this gentleman fired a gun. It does not rule out, a negative test does not, does not make a positive finding. It simply means that laboratorywise we have no evidence.

Moreover, the appellate record contains no indication that a gunshot residue test was ever actually performed on Bonnell's *hands*. Although the petitioner's hands were "bagged" to preserve any traces of residue for just such a test, and although a defense expert later stated that a firearm like the murder weapon "would produce significant amounts of gunshot residue" "likely to be deposited on the hands of a person firing this type of weapon," the failure of both the prosecution and the defense to uncover any evidence that such an examination occurred leads to a conclusion that no *Brady* violation is present in this regard.

In any event, defense counsel was able to make use during closing argument of the state's failure to provide the test results on Bonnell's hands. As one of his last statements to the jury, the petitioner's lawyer surmised:

> And I wonder what the tests that the police performed on [the petitioner's] hands, the gun powder residue test showed. You'll never know, will you? I know one thing, if they were positive, if they showed that this guy fired a gun, they would be here with bells on telling you that from that witness stand. But you'll never know.

Thus, the petitioner was, in fact, able to present to the jury his theory that gunshot residue tests on Bonnell were negative and that such laboratory results necessarily cast doubt upon evidence of the petitioner's guilt. Even in light of that argument, however, the jury still voted unanimously to convict Bonnell of the crimes for which he was indicted. The petitioner is thus unable to establish that disclosure of the allegedly suppressed evidence would have altered the jury's verdict.

Bonnell also asserts that suppressed police investigative reports would have established that Darryl Butcher and Joseph Stevens Egnor, also known as Joseph Popil, should have been considered suspects for the murder and that presentation of evidence concerning those two individuals would have deflected a finding of guilt from the petitioner. According to Bonnell, police records would have shown that Butcher resented Bunner because Bunner alone had avoided arrest for a prior drug transaction that involved Butcher, Bunner, and other individuals. Furthermore, another police report memorialized that Ed Birmingham stated in an interview "that there is talk on the street that Butcher[ ]

was the one that set up Eugene's killing." The information highlighted in this appeal by the petitioner would not, however, have resulted in a different jury verdict. Despite the evidence of animosity between Butcher and Bunner, absolutely no evidence placed Butcher at or near the crime scene at the time of the murder. Additionally, even in the police report mentioning the "talk on the street," Birmingham unequivocally stated that Bonnell killed Bunner and that there was "no way" Butcher was involved in the crime. Finally, the petitioner himself was aware of Butcher's existence and could have gathered information from him prior to trial. Thus, no *Brady* violation occurred in this regard.[1]

Similarly, Bonnell's assertion of a *Brady* violation in the non-disclosure of certain police reports discussing Popil is flawed because of the petitioner's failure to establish that any material evidence was suppressed. Bonnell argues before this court that the descriptions of the murderer given by Birmingham and Hatch also fit Popil, that Popil was observed shortly after the shooting wearing a jacket stained with a substance that appeared to be blood, and that Popil was familiar with the idiosyncrasies of the murder weapon. Popil himself testified at trial, however, and defense counsel was given a full opportunity to cross-examine the witness about any alleged involvement in the murder of

---

[1]The Ohio Supreme Court did not engage in an extended treatment of the allegation of error, instead stating only that "[w]ith respect to appellant's remaining propositions of law, after careful review of the record and case law, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial." *State v. Bonnell*, 573 N.E.2d at 1089. Moreover, the decision on the issue by the Ohio Court of Appeals involved merely a conclusion that the claim should be viewed as a challenge to a denial of a discovery motion, not as an allegation of constitutional misdeeds. *See State v. Bonnell*, No. 55927, 1989 WL 117828 at *6 (Ohio App. 8 Dist. Oct. 5, 1989).

Eugene Bunner. Because Bonnell knew of Popil's existence[2] and was able to elicit whatever information he wished from the witness at trial, the petitioner was in no way harmed by any suppressed reports that might have described facts about which Popil was eventually cross-examined.

Bonnell next contends that he should have been supplied with police reports that could have impugned the credibility of prosecution witnesses Birmingham and Hatch. Specifically, the petitioner alleges that the prosecution suppressed reports that would have established the existence of conflicting statements given to the police by eyewitnesses to the murder – statements in which they initially denied knowing the petitioner– and also established that Hatch might have received favorable consideration in a pending assault case based upon her testimony against Bonnell. Again, however, defense counsel was able to cross-examine both Birmingham and Hatch about the alleged inconsistencies in the identifications of the murderer and also question Hatch about her federal felony conviction.[3] Consequently, the petitioner was not prejudiced in any way by the non-disclosure of the alleged impeachment evidence.

---

[2]In fact, Bonnell's defense to the murder charge was that he was out drinking with Popil on that evening and that the petitioner eventually passed out as a result of his alcohol intake.

[3]Birmingham explained that he did not recognize the petitioner immediately after the shooting because he had seen Bonnell only a few times previously, none of which were close to the time of the murder. Further, Birmingham explained that he denied knowing "Melvin Bonnell" because he knew the petitioner only as "Peanuts."

Bonnell next attempts to establish the existence of a *Brady* violation by arguing that two police officers involved in the car chase of the petitioner that ended when Bonnell crashed into a funeral chapel gave slightly different accounts of the starting point of the chase and mistakenly testified at trial that no police reports of the chase were prepared. He then seeks to use reports that were prepared by other individuals to intimate that the difference in the chase descriptions given by the police officers actually involved in the pursuit and the accounts contained in the reports establishes that the police manufactured evidence to coincide with their theory of the case.

First, the descriptions of the start of the chase given by Officers Montalyo and Jesionowski do not necessarily justify even the "trivial discrepancy" label applied to them by the petitioner in his brief. The relevant portion of the chase occurred in an area of Cleveland that can roughly be described as a parallelogram bounded on the north by Bridge Avenue, on the south by Lorain Avenue, on the east by West 57th Street, and on the west by West 58th Street. Another Cleveland road mentioned in the trial transcripts, Fir Avenue, juts west from West 58th Street just south of the intersection of West 58th Street and Bridge Avenue. The residence in which Eugene Bunner was murdered was located at 5709 Bridge Avenue, between West 57th and West 58th Streets.

Officer Montalyo testified that he and his partner, Jesionowski, were driving west on Bridge Avenue in the early morning hours of November 28, when they observed an individual in a blue 1980 Chevrolet backing up on Bridge Avenue toward West 58th Street

without the use of headlights.[4] The car, still being driven in reverse, then turned south onto West 58th and, eventually, west onto Fir Avenue. When the officers followed the Chevrolet and attempted to detain the driver, the motorist put the car into drive, turned left off Fir Avenue back onto West 58th Street, heading north. According to Montalyo, the car then made a right turn onto Bridge Avenue, proceeded east to West 57th Street, turned right onto West 57th, continued south on West 57th to Lorain Avenue, turned left onto Lorain, and continued traveling eastward on Lorain until the driver lost control of the vehicle and crashed into the funeral home.

Officer Jesionowski's description of the car chase was identical to that of Montalyo in all relevant aspects except that Jesionowski claimed that the blue Chevrolet was first spotted by the officers not as the policemen were driving westward on Bridge Avenue, but when their patrol car was "stopped on 57th and Bridge facing southbound." As soon as the driver of the Chevrolet "started backing up without headlights," however, the officers turned west onto Bridge Avenue and began the pursuit also described by Montalyo. It is difficult to imagine how the two officers' descriptions of the pursuit could be considered substantially in conflict, based solely on whether the pursuit actually began before or after the police turned onto Bridge Avenue. In any event, the jury's verdict was not affected by any constitutional violation in this regard because the alleged "discrepancy" in the officers' testimony was not hidden in suppressed documents but, rather, surfaced during the trial

---

[4]The blue Chevrolet, first seen on Bridge Avenue between West 57th and West 58th Streets, would necessarily have been in the vicinity of the crime scene at 5709 Bridge Avenue.

testimony of the officers. Because Bonnell was able to cross-examine the police officers regarding their recollections of the chase of the petitioner, any inconsistencies that the petitioner felt were germane to the presentation of his defense could have been elucidated.

Bonnell's more traditional *Brady*-violation assertion, involving the police officers' accounts of the chase of the petitioner, consists of a claim that Montalyo and Jesionowski testified that they made no official reports of the chase, yet just such reports were discovered by the defense team after trial. The officers did indeed testify at trial that they did not make any reports of their activities concerning the chase of Bonnell's vehicle. Furthermore, as the petitioner argues on appeal, written reports of the chase did later surface. The reports Bonnell cites, however, were *not* prepared by officers Montalyo and Jesionowski, but rather by Detective Hayes and by county coroner Elizabeth Balraj. While it is true that neither written report coincided exactly with the accounts offered by the officers who actually participated in the chase, contrary to Bonnell's allegations before this court, the written reports later discovered by the defense team certainly did *not* indicate unequivocally "that the high-speed chase commence[d] blocks away from the scene of the crime at Lorraine [sic] and West 58th, and not at 57th and Bridge, the location of the homicide." In any event, because this allegation of error relies completely on written police reports prepared by individuals with no first-hand knowledge of the situation being described, the petitioner cannot establish that the jury would have altered its verdict in light of the noted discrepancy between the officers' trial testimony and the written reports. Indeed, even had the chase commenced at the intersection of West 58th Street and Lorain

Avenue, such evidence would not have undermined the evidence that Bonnell was the sole occupant of the car and that the petitioner was identified by eyewitnesses as Bunner's assailant. This claim of withholding of exculpatory evidence is thus also without merit.

Bonnell next contends that the prosecution failed to inform him of evidence the state possessed that suggested that the petitioner confessed his complicity in the murder to a jail inmate before trial. Even though no such testimony was offered at trial, Bonnell now insists that if the state had disclosed to the defense that the alleged confession was purportedly made to a prisoner who had already been released from custody prior to Bonnell's arrest, the petitioner would have testified at trial to rebut the prosecution's theory of the case. Whether Bonnell in fact did offer such a confession was, however, information best known by the petitioner himself. Consequently, because the "withheld" evidence was not exclusively within the possession of the prosecution, the protections afforded by *Brady* are not implicated in this issue. *See*, *e.g.*, *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (courts will not find a *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available . . . from another source" (citations and internal quotation marks omitted)).

In his final *Brady* issue, Bonnell asserts that he was denied the opportunity to challenge the prosecution's theory of the case when he was not given, prior to trial, a police report that indicated that drops of the victim's blood were detected on a green vinyl pillow

found on the back porch of the apartment where the victim lived, as well as on the railing

of that porch. According to the petitioner, had he been made aware of that evidence, and

had he known the blood samples came from the back porch of the apartment, he could

have argued successfully to the jury that the shooting and beating could not have occurred

as described by Birmingham and Hatch because those witnesses swore that the assault

was confined to the kitchen area of the apartment. Bonnell submits that, had the scuffle

occurred only in the kitchen, he himself could not have transferred the victim's blood to the

pillow and to the railing without also having significant blood stains on his own body and

clothing, stains that were admittedly not found during forensic testing. Rather, he

surmises, the blood stains support a theory that Bunner was shot in a different location by

another individual and then dragged into the Birmingham/Hatch/Bunner kitchen.

It is, however, conceivable that blood from the victim could have been transferred

only to Bonnell's hands during a kitchen fight and then from Bonnell to the railing and pillow

when Birmingham threw the petitioner from the apartment out the back door. Furthermore,

the trial testimony of the expert witness did not definitively match the blood samples to the

victim but, rather, concluded only that the blood on the pillow was consistent with the blood

type of the victim. Thus, even had the petitioner known at trial that blood samples

"consistent with" the victim's blood type had been collected from an area of the apartment

where eyewitnesses claimed Bonnell and Bunner did not fight, it is still not reasonably

probable that the jury would have altered its verdict based on that fact alone, given the

remaining overwhelming evidence of the petitioner's guilt. This claim of error is thus also without merit.

Without question, Bonnell has highlighted various inconsistencies and weaknesses in the prosecution's case against him. Unfortunately for Bonnell, however, the jury that heard the evidence presented still chose to credit the state's theory of the case. The petitioner has failed to establish a reasonable probability that the information later discovered by the defense and not provided by the prosecution would have led the jury to a different conclusion.

**B. Failure to Correct Materially False Testimony or Impressions**

Bonnell next maintains that he was denied due process of law when the prosecution failed to correct testimony offered at trial that the state knew, or should have known, was false. Without question, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted).

In this appeal, the petitioner points to two instances that he argues should result in the reversal of his convictions for the reasons announced in *Napue*. First, Bonnell contends that the prosecution was aware that the green vinyl pillow that contained blood

stains consistent with the victim's blood type did not belong to the petitioner, even though

Linda Luke, a member of the Cuyahoga County Trace Evidence team, was permitted to

testify that she received for testing "a green pillow and a jacket, property of Melvin Bonnell."

A close examination of the statement made by Luke, however, does not confirm that the

witness made a false statement at all. Rather, in light of other information in the record,

the better interpretation of Luke's trial testimony is that the witness explained that she

received from the police a green pillow and a jacket, and that *the jacket* was "property of

Melvin Bonnell." Such an interpretation is not only grammatically plausible, but factually

probable given the wording of the Trace Evidence Department's written report on the tests.

In that memorialization, Luke listed the items she tested as "#2237-87E-646 Green pillow"

and "#2238-87E-647 Jacket property of Melvin Bonnel [sic]." Thus, nowhere in Luke's trial

testimony or in her written report does she attribute ownership of the pillow to the

petitioner. In any event, even if Luke had stated unequivocally that the pillow of unknown

ownership belonged to the petitioner, that brief reference in the course of the lengthy trial

would in no way have prejudiced Bonnell, especially in light of the fact that the prosecution

later announced to the trial judge, "We are going to withdraw Exhibit 23, that green pillow."

Bonnell's second example of allegedly false testimony countenanced by the

prosecution involved statements of the police officers who participated in the car chase of

the petitioner that no police reports concerning the chase had been prepared when, in fact,

reports of the incident were generated. Again, however, a closer examination of the exact

comments offered by the witnesses demonstrates the lack of mendacity in this instance

as well. Both Officer Montalyo and Officer Jesionowski merely confirmed at trial that *they themselves* made no reports of the incident. Indeed, the reports to which the petitioner refers on appeal were prepared by other individuals, not by the partners who followed Bonnell until he crashed into the funeral home.

Because no falsehoods were thus actually communicated by the witnesses identified by Bonnell in this issue, the prosecution did not deny the petitioner a fair trial as guaranteed by Fourteenth Amendment as alleged by the petitioner. This issue is patently without merit.

## C. Prosecutorial Misconduct

In his final issue on appeal, Bonnell contends that his convictions must be reversed because of numerous instances of prosecutorial misconduct during trial. This court has recently reiterated that the critical inquiry when examining such allegations "'is the fairness of the trial, not the culpability of the prosecutor.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Consequently, we must determine "whether the improper comments or actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 515 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). When doing so:

> [T]his circuit employs a two-prong test. *See United States v. Carter*, 236
> F.3d 777, 783 (6th Cir. 2001). First, this court determines whether the
> prosecution's conduct or remarks were improper. If the answer is affirmative,

> then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong[;] (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally. *Id.*

*Slagle*, 457 F.3d at 515-16.

In one of his prosecutorial misconduct claims, Bonnell asserts that the state improperly questioned witnesses Michelle Janics and Charles Rowland about animosity that the petitioner might have felt toward Rowland, possibly because Rowland was dating Janics, Bonnell's former girlfriend. Both Janics and Rowland testified that the petitioner would crawl through Janics's bedroom window "every morning" in an effort to reconcile with her. The first time Janics mentioned the petitioner's somewhat unusual behavior, defense counsel objected and the trial judge directed the prosecutor to "[g]o to something else." Nevertheless, the prosecutor later asked Janics "whether there was any problem between [Bonnell] and Charlie." The court immediately sustained the interposed objection, as it did when the prosecutor persisted in asking whether Janics "did anything in particular to avoid [the petitioner]" and whether she wanted him "to know [her] whereabouts."

When Rowland took the stand following Janics's testimony, the prosecutor asked the witness to describe the circumstances surrounding Rowland's last encounter with Bonnell. The witness mentioned that he had last seen the petitioner the month before Bunner's murder when Bonnell "kept climbing in through the windows and threatening our

lives." The defense's objection to the answer was sustained, as was the state's follow-up question inquiring whether Rowland "had any problems with [the petitioner]."

Bonnell now asserts that the improper comments and questions were designed to appeal to the jury's passion and prejudice by casting the petitioner as a vengeful individual with a history of entering homes and a penchant for threatening violence. To the extent that the prosecution's questions or the witnesses' answers were improper, however, the trial court promptly and consistently sustained objections raised by counsel, and on two occasions, directed the prosecutor to move to another topic of questioning. Moreover, consideration of the four factors listed in *Carter* leads to the conclusion that any impropriety in this regard was not sufficiently flagrant to warrant reversal of the petitioner's convictions. First, the evidentiary case against Bonnell was extremely strong. Not only did two eyewitnesses to the crimes identify the petitioner as the perpetrator, but police chased Bonnell from the vicinity of the crime scene and recovered the murder weapon, a firearm belonging to Bonnell, near the site of the ensuing car crash. Furthermore, even though the allegedly improper remarks seemed to have been made deliberately by the prosecutor, they were parts of only brief exchanges with two witnesses. Finally, the trial court's instructions to the jury and his evidentiary rulings ensured that the finders of fact were not misled by any improper comments and also that the petitioner was not unduly prejudiced by them.

Before this court, Bonnell also identifies numerous other instances of alleged prosecutorial misconduct. However, none of these allegations of misconduct were presented by Bonnell to the Ohio Court of Appeals on direct review of the petitioner's convictions and sentences. Consequently, when Bonnell raised these claims during his state post-conviction proceedings, the state court found consideration of them to be barred by the doctrine of res judicata. *See State v. Bonnell*, No. CR 223820 (Cuyahoga County Ct. of Common Pleas Oct. 17, 1995) (Findings of Fact and Conclusions of Law).

The State of Ohio thus argued before the district court, and now on appeal, that Bonnell procedurally defaulted these claims. "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An exception to that general rule exists, however, if "the petitioner can show cause for the default and actual prejudice, or a resultant fundamental miscarriage of justice," *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)), such that a constitutional violation has probably resulted in the conviction of an individual who is actually innocent.

As we have previously explained:

> In the Sixth Circuit, a four-part analysis is used when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). First, the court must ascertain whether there is an applicable state procedural rule. Second, the court must determine whether the state courts

actually enforce the rule. Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally . . ., if the criminal defendant did not comply with the rule, the defendant must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Jamison v. Collins*, 291 F.3d 380, 385-86 (6th Cir. 2002).

Prior decisions of this court have conclusively provided answers to the first three inquiries of any *Maupin* analysis. In *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037 (2005), for example, the panel stated specifically that "[i]n Ohio, res judicata bars state courts from considering constitutional claims in post-conviction collateral attacks (brought under Ohio Rev. Code Ann. § 2953.21) when those claims have already been or could have been fully litigated on direct appeal." Next, in *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005), citing numerous prior Sixth Circuit decisions, we noted that "this court has rejected claims that Ohio has failed to apply [the doctrine of *res judicata*] consistently." "Moreover, this court has . . . held that *res judicata* is an adequate and independent state ground for barring habeas review of constitutional claims." *Id.* (citing *Coleman v. Mitchell*, 268 F.3d 417, 427, 429 (6th Cir. 2001)).

Because Bonnell clearly did not present most of his claims of prosecutorial misconduct in a timely manner, he may excuse his procedural default of those allegations only by showing cause for ignoring the applicable state procedural rule and demonstrating

that he has been prejudiced by the constitutional errors. The petitioner has failed to satisfy this burden as well. In fact, Bonnell does not even attempt to identify a cause for the default in his initial brief before this court. Only in his reply brief does he make even the most cursory of attempts to argue that the ineffectiveness of his appellate counsel should excuse his failure to have raised the prosecutorial misconduct issues on direct appeal. Even then, the petitioner's conclusory allegations of ineffectiveness do not prove how Bonnell was prejudiced by specific deficiencies in his legal representation. Given such failures in proof, and the absence of any indication that the petitioner was actually innocent of the crimes for which he was convicted, we should find these additional claims of prosecutorial misconduct procedurally defaulted.

## III. **CONCLUSION**

For the reasons set out above, we AFFIRM the decision of the district court denying issuance of the writ of habeas corpus in favor of the petitioner.