**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bonnell,* Slip Opinion No. 2018-Ohio-4069.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4069

THE STATE OF OHIO, APPELLEE, *v.* BONNELL, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bonnell,* Slip Opinion No. 2018-Ohio-4069.]**

*Criminal law—Postconviction DNA testing—Appellant failed to demonstrate that results of testing of any evidence he sought to have tested could be outcome determinative—This court lacks jurisdiction to consider matters relating to adequacy of prosecution's search for biological material that could be tested—Trial court's denial of application for testing affirmed.*

(No. 2017-1360—Submitted August 1, 2018—Decided October 10, 2018.)

APPEAL from the Cuyahoga County Court of Common Pleas,

No. CR-87-223820-ZA.

_____

**O'DONNELL, J.**

{¶ 1} Melvin Bonnell appeals from the denial of his second application for DNA testing, following his conviction and death sentence for the 1987 murder of Robert Eugene Bunner. He presents two propositions of law for our consideration. We lack jurisdiction to consider the first proposition of law and conclude that

Bonnell has failed to show any of the evidence he sought to have tested could be outcome determinative. Accordingly, we affirm the judgment of the trial court.

**Factual and Procedural Background**

*Bonnell's conviction and direct appeals*

{¶ 2} A Cuyahoga County grand jury indicted Bonnell on two counts of aggravated murder (R.C. 2903.01), each with firearm and aggravated-burglary specifications; one count of aggravated burglary (R.C. 2911.11), with firearm and prior-offender specifications; and one count of possessing a weapon under disability (R.C. 2923.13) with specifications. In our decision on Bonnell's direct appeal, we summarized the facts of the case:

> Shirley Hatch, Edward Birmingham and Robert Eugene Bunner shared an apartment on Bridge Avenue in Cleveland, Ohio. On November 28, 1987, at approximately 3:00 a.m., Hatch heard someone knock at the kitchen door of the apartment. Hatch asked who was at the door and a voice replied, "Charles." Bunner opened the door and appellant, Melvin Bonnell, entered the apartment and closed the door behind him. Appellant uttered an expletive directed at Bunner and then proceeded to fire two gunshots at Bunner at close range. Bunner fell to the floor and Hatch, who had witnessed the shooting, ran to a bedroom where Birmingham was sleeping. Hatch heard two more gunshots, awoke Birmingham to tell him that Bunner had been shot, and then fled from the apartment to call paramedics. Birmingham went to the kitchen.
>
> Upon entering the kitchen, Birmingham observed appellant who was on top of Bunner "* * * pounding him in the face." Birmingham also observed bullet holes in Bunner's body. Birmingham grabbed appellant and ejected him from the apartment.

2

At approximately 3:40 a.m., two Cleveland police officers were patrolling Bridge Avenue in a police cruiser when they observed a blue vehicle being driven backwards on Bridge Avenue with its headlights off. The officers attempted to stop the vehicle, and a high-speed chase ensued when the driver of the vehicle failed to stop. During the chase, the officers never lost sight of the vehicle except, perhaps, for a few seconds. The officers never saw anyone in the vehicle except the driver. No one exited the vehicle during the chase. The chase ended when the driver of the blue vehicle crashed into the side of a funeral chapel. The officers removed the driver from the vehicle and placed him on the ground. Both officers identified appellant as the driver of the vehicle.

Shortly after the accident, Cleveland police officers Stansic and Kukula arrived at the crash site and saw a man lying on the ground with police officers standing over him. However, officers Stansic and Kukula left the accident scene almost immediately thereafter in response to a radio call regarding the shooting at the Bridge Avenue apartment.

Upon arriving at the apartment, officers Stansic and Kukula interviewed Hatch and Birmingham who provided the officers with a description of Bunner's assailant. The officers recognized the witnesses' description as meeting the description of the man they had observed at the accident scene. The officers asked Birmingham to accompany them to the hospital where the man had been transported following the accident. At the hospital, Birmingham identified appellant as Bunner's assailant.

Bunner died as a result of a gunshot wound to the chest. An autopsy revealed that Bunner was shot twice, once in the chest and

once in the pubic region. Both bullets were recovered from the body.

Police officers retraced the chase scene and found a .25 caliber automatic pistol which was later identified as appellant's. The weapon was test-fired and the test bullets were compared to the bullets found in Bunner's body. The test bullets and the bullets retrieved from Bunner's body had the same characteristics, and test casings matched spent bullet casings found at the murder scene.

(Ellipsis sic.) *State v. Bonnell*, 61 Ohio St.3d 179, 179-180, 573 N.E.2d 1082 (1991).

{¶ 3} On March 3, 1988, a jury found Bonnell guilty of aggravated burglary and two counts of aggravated murder with specifications, and it recommended a sentence of death, which the trial court imposed.

{¶ 4} The Eighth District Court of Appeals affirmed in part. It sustained Bonnell's convictions for aggravated burglary and aggravated murder, held that the two aggravated murder counts should have been merged for sentencing purposes, but determined that error was harmless, and also vacated Bonnell's prison sentence for aggravated burglary because the record did not demonstrate that he was present in court when it was imposed, but remanded for a new sentencing hearing on that count. 8th Dist. Cuyahoga No. 55927, 1989 Ohio App. LEXIS 4982 (Oct. 5, 1989).

{¶ 5} In a separate entry, the court of appeals affirmed the capital sentence. 1989 Ohio App. LEXIS 5028 (Oct. 5, 1989). On further appeal, we affirmed the aggravated murder conviction and capital sentence, finding the evidence of guilt to be "overwhelming." 61 Ohio St.3d at 183, 573 N.E.2d 1082.

*Petitions for collateral relief*

{¶ 6} On March 16, 1995, Bonnell filed a 53-count petition for postconviction relief. He alleged that the state violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding police and lab reports containing

material, favorable information. Moreover, Bonnell alleged that the state failed to preserve blood evidence found on the back porch and the stairs leading up to the porch. He also asserted that his rights were violated because the state never tested physical evidence, including vomit found in the kitchen near the body, fingerprints at the scene, Bonnell's hands, the contents of his automobile, or his pants.

{¶ 7} The trial court denied the petition, but the Eighth District Court of Appeals sua sponte remanded "for clarification as to whether or not the trial court reviewed the original trial transcript." 8th Dist. Cuyahoga No. 69835 (July 12, 1996). In 1997, the trial court again denied the postconviction petition, and the court of appeals affirmed. 8th Dist. Cuyahoga Nos. 69835 and 73177, 1998 Ohio App. LEXIS 3943 (Aug. 27, 1998). The appeals court deemed the statements in the police reports to be either "immaterial" or "minor inconsistencies." *Id.* at *13-14. We declined to exercise jurisdiction. 84 Ohio St.3d 1469, 704 N.E.2d 578 (1999).

{¶ 8} In 2000, Bonnell filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio. The federal court agreed with the Eighth District that any inconsistent statements in police interviews that had not been turned over to the defense were, for the most part, immaterial, *Bonnell v. Mitchel*, 301 F.Supp.2d 698, 728-729 (N.D.Ohio 2004), and the Sixth Circuit Court of Appeals affirmed, 212 Fed.Appx. 517 (6th Cir.2007). In its opinion, the appellate court observed that the failure to disclose a negative gunshot-residue test was harmless because the state did not claim to have found residue on Bonnell's clothes, and thus, the defense was able to and did argue that the jury could assume the tests on Bonnell's hands were negative. *Id.* at 522-523.

*Initial application for DNA testing*

{¶ 9} On October 29, 2004, Bonnell submitted his first application for DNA testing. He requested testing of four items:

[1]     vomit found in kitchen,

[2]     Blood from [his] vehicle,

[3]     hair on green pillow, [and]

[4]     Plastic bags for Gun Shot residue.

In addition, his memorandum in support requested testing of the blood recovered from the rear steps, railings, and stairwell, as well as swabs or slides taken from Bonnell's own hands.

{¶ 10} After five extensions of time, the state responded to the application on August 30, 2005. The state argued, among other things, that the application should be denied because "no parent sample[1] exists with which to do a DNA comparison." The trial court accepted the state's representations, and denied the petition on October 21, 2005.

*The instant appeal*

{¶ 11} After the General Assembly enacted a new DNA-testing statute, Bonnell filed a new application for DNA testing with the trial court on February 6, 2008. In his second application, Bonnell requested DNA testing of:

[1]     swabs and slides of blood recovered from the crime scene;

[2]     swabs and slides of blood recovered from [his] hands, jacket and other clothes;

[3]     vomit found in kitchen;

[4]     blood from [his] vehicle;

[5]     hair on green pillow;

[6]     plastic bags for gunshot residue; [and]

---

[1] The term "parent sample" means "the biological material first obtained from a crime scene or a victim of an offense * * * and from which a sample will be presently taken to do a DNA comparison to the DNA of the subject offender." R.C. 2953.71(M).

6

[7]     1 or 2 guns recovered by Cleveland police.

On April 23, 2008, the state informed the court that it had located Bonnell's jacket in the Eighth District Clerk's files, and it agreed to DNA testing. The parties then submitted a joint motion for DNA testing of the jacket, which the court granted.

{¶ 12} The state filed the results of the DNA testing on July 7, 2009, which concluded that DNA samples taken from multiple locations on the jacket came from a male donor, and that Bonnell could be excluded as a contributor. Five samples, however, were consistent with the DNA profile of Bunner. With respect to two samples, obtained from the right upper sleeve and right lower back, the report noted that the probability of selecting a random, unrelated person from the population having the same partial DNA profile was 1 in 239,000 individuals.

{¶ 13} The remainder of Bonnell's second application lay dormant for years until, on April 26, 2017, he filed a motion to compel the state to provide an accounting of the physical evidence from the case. In response, the prosecuting attorney submitted a report, including an affidavit from Christopher D. Schroeder, on June 15, 2017, detailing his efforts to locate evidence from the trial. Those efforts included personally searching and/or arranging for searches of the prosecutor's property room, the office of the Cuyahoga County Clerk of Courts, the Cleveland Police department property room, the "dead files" section of the Eighth District Court of Appeals, the Bureau of Criminal Investigation, the Cuyahoga County Medical Examiner's Office, and the Western Reserve Historical Society (which sometimes receives items from old cases). Schroeder spoke with multiple former prosecutors, including the lead prosecutor at trial and a member of the appellate team, as well as investigating police officers and at least one assistant attorney general. He also tried to speak with the court reporter who transcribed the trial, but she was deceased.

**{¶ 14}** Schroeder's investigation revealed that the Medical Examiner's Office still had possession of 7 autopsy microslides, 4 swabs from Bonnell's jacket, and 1 swab from an autopsy microslide, as well as the jacket itself. The lead prosecutor signed out the murder weapon, pellets, and cartridge case on "February 18, 1987 [sic, 1988]" and never returned them. The .25 caliber shell casings had also been signed out, but the name was illegible. A second weapon seized during the investigation, but not connected to the crime, had been destroyed. Other items, including the pillow, had been sent from the police property room to the coroner in November 1987 but never returned.

**{¶ 15}** On August 14, 2017, the trial court denied the second application, for two reasons. First, relying on Schroeder's affidavit, the court determined that no parent sample of any biological material still exists for testing, other than the jacket that has already been tested. The court's judgment specifically noted that the Schroeder affidavit satisfied all the statutory requirements and demonstrated that the search had been adequate.

**{¶ 16}** Second, even if any biological material *did* exist, the trial court concluded that Bonnell "cannot show that any additional DNA testing would be outcome-determinative." According to the court, the evidence of guilt presented at trial, including the eyewitness testimony of Hatch and Birmingham, the testimony that the car chase began near the victim's apartment shortly after the shooting, Birmingham's identification of Bonnell as the shooter, the discovery of the murder weapon along the route of the car chase, and the ski jacket in Bonnell's car that matched the description of the shooter's jacket, was overwhelming. Coupled with the 2009 DNA test that showed Bunner's blood on the jacket, the trial court found that "Bonnell's case does not present this Court with a plausible claim of actual innocence."

**{¶ 17}** Bonnell appealed that decision.

8

**Law and Analysis**

{¶ 18} If an eligible offender submits an application for DNA testing under R.C. 2953.73, the prosecuting attorney must use "reasonable diligence" to determine whether (1) biological material was collected from the crime scene or victim against which a sample from the offender may be compared, and (2) whether the parent sample of that biological material still exists. R.C. 2953.75(A). In exercising that diligence, the prosecuting attorney must rely on "all relevant sources," including but not limited to (1) all prosecuting authorities involved in the case, (2) all law enforcement involved in the investigation, (3) all custodial agencies involved at any time with the biological material, (4) the custodians of the custodial agencies, (5) all crime laboratories involved at any time with the biological material, and (6) all other "reasonable sources." *Id*. The prosecuting attorney must prepare and file a report containing the required determinations. R.C. 2953.75(B).

{¶ 19} A court may accept an R.C. 2953.73 application for DNA testing only if it determines that six conditions apply, two of which are central to this appeal. First, the court must determine that biological material was collected from the crime scene or the victim and that the parent sample still exists. R.C. 2953.74(C)(1). And second, a trial court may accept a DNA application only if it determines that "if DNA testing is conducted and an exclusion result is obtained, the exclusion result would be outcome determinative." R.C. 2953.74(C)(4). In its current form, the Revised Code defines "outcome determinative" to mean that, had the testing been presented at trial and admitted into evidence, when considered alongside the other evidence in the case, "there is a strong probability that no reasonable factfinder would have found the offender guilty of [the] offense or, if the offender was sentenced to death relative to that offense, would have found the offender guilty of the aggravating circumstance or circumstances the offender was found guilty of committing and that is or are the basis of that sentence of death." R.C. 2953.71(L).

*Determination that testing would not be outcome determinative*

**{¶ 20}** In this second proposition of law, Bonnell contends that the trial court erred in its determination that he was not entitled to DNA testing (assuming any materials exist for testing) because the results would not be outcome determinative. For example, on the night of the murder, Bonnell was bar-hopping with a friend named Joseph Egnor, a.k.a. Joseph Popil. Bonnell has suggested that Popil may have been the actual shooter. Popil owned a red jacket with the words "Devil's Den" on the back. In his reply brief, Bonnell suggests that if testing of Popil's jacket revealed the victim's blood, that result would be outcome determinative. But Bonnell's application did not include a request to test Popil's jacket, and that matter is not before us.

**{¶ 21}** As for the items he *did* ask to have tested, we recognize that DNA testing would not have changed the outcome of the trial. According to Bonnell, a DNA test of his jacket would be strong evidence of his innocence if it detected no trace of the victim's blood. According to Birmingham, the shooter crouched over Bunner after shooting him and punched him repeatedly. It stands to reason that the assailant would have Bunner's blood on his clothing. Therefore, Bonnell suggests, DNA testing of his clothes that failed to detect the victim's blood would make it obvious that he could not have committed the crime. But the state's forensic witness testified at trial that Bunner's blood was not on the jacket, so Bonnell already had the opportunity to argue his innocence based on the absence of blood evidence. Despite this evidence, the jury convicted him. A new test would not strengthen his innocence claim. (The parties disagree over whether the detection of Bunner's blood on the jacket in 2009 resulted from more sophisticated testing methods (the state's position) or improper storage and cross-contamination (Bonnell's position), but that argument is ultimately not relevant, because the 2009 test results were not presented to the jury.)

{¶ 22} The same is true with respect to evidence recovered from Bonnell's hands and his car: the jury convicted him despite the state's inability to show gunshot residue on his hands or blood in his car.

{¶ 23} The second DNA application also mentions a hair supposedly found on a green pillow that was recovered from the scene. Trial testimony indicated that the pillow had Bunner's blood on it. The state ultimately withdrew it as an exhibit and it was never offered into evidence. After trial, it was revealed that the investigating officers found the pillow on the back porch, not inside the apartment, as had been assumed at trial. But even assuming a DNA test proved that the hair did not belong to Bonnell, it is unclear how this would be exculpatory, much less outcome determinative.

{¶ 24} Bonnell's claim that vomit may be outcome determinative is not well taken. There is no evidence in the record to suggest that the vomit was ever collected or stored, and therefore, it cannot be outcome determinative.

{¶ 25} Bonnell devotes the bulk of his brief to arguing what he believes to be the weakness of the evidence against him, based largely on evidence disclosed postconviction. But he fails to show that DNA testing, if performed, would yield a result that would be outcome determinative. We therefore reject this second proposition of law.

*Due process*

{¶ 26} In his first proposition of law, Bonnell asserts a due-process right to challenge in the trial court the adequacy of the state's search for the evidence. We note that our appellate jurisdiction exists by virtue of R.C. 2953.72(A)(8), which provides in relevant part that a capitally sentenced defendant may "appeal the rejection" of an application for DNA testing to the supreme court, and that "no determination otherwise made by the court of common pleas in the exercise of its discretion regarding the eligibility of an offender or regarding postconviction DNA testing under these provisions is reviewable by or appealable to any court." By its

plain terms, the statute limits our jurisdiction to a determination of whether or not to grant DNA testing. We therefore cannot consider matters relating to the adequacy of the state's search for evidence.

**Conclusion**

{¶ 27} Because the statute limits our jurisdiction to reviewing the denial of DNA testing by a trial court, we lack jurisdiction to entertain the first proposition of law. With respect to the second proposition of law, Bonnell has failed to demonstrate any of the evidence he sought to test could be outcome determinative and therefore, this proposition is overruled. Accordingly, we affirm the judgment of the trial court.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

_____

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Kimberly S. Rigby and Kandra Roberts, Assistant Public Defenders, for appellant.

_____